UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES *ex rel.*, <br> EUGENE J. GUGLIELMO, PH.D. <br> 5825 Edgehill Drive <br> Alexandria, Virginia 22303 | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiff-Relator, | ) <br> ) <br> ) | |
| BRINGING THIS ACTION ON BEHALF <br> OF THE UNITED STATES OF AMERICA | ) <br> ) <br> ) <br> ) | Complaint filed **Under Seal** <br> pursuant to <br> 31 U.S.C. § 3730(b)(2) |
| JESSIE K. LIU <br> United States Attorney <br> Judiciary Center Building, <br> 555 Fourth Street, N.W. <br> Washington, D.C. 20530 | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| and | ) <br> ) | |
| c/o <br> WILLIAM P. BARR <br> Attorney General of the United States <br> U.S. Department of Justice <br> 950 Pennsylvania Avenue, N.W. <br> Washington D.C. 20530 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| vs. | ) <br> ) | |
| LEIDOS, INC. <br> 11951 Freedom Drive <br> Reston, Virginia 20190 | ) <br> ) <br> ) <br> ) | |
| CERNER CORPORATION, <br> 2800 Rockcreek Parkway <br> North Kansas City, Missouri 64116 | ) <br> ) <br> ) <br> ) | |
| CERNER GOVERNMENT SERVICES, INC., <br> 10200 Abilities Way <br> Kansas City, Kansas 66111 | ) <br> ) <br> ) <br> ) | |
| ACCENTURE <br> 800 North Glebe Road, Suite 300 <br> Arlington, Virginia 22203 | ) <br> ) <br> ) <br> ) | |

HENRY SCHEIN INC.                                )
135 Duryea Road                                  )
Melville, New York 11747                         )
                                                 )
                        Defendants.              )

## COMPLAINT

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et al.* of the False Claims Act filed by Relator/Plaintiff Eugene J. Guglielmo, Ph.D. in the name of the United States Government and himself to recover penalties and damages arising from Defendants' violations of federal requirements concerning contracts with the United States Department of Defense (hereinafter "Agency" or "DoD").

## INTRODUCTION

1.    Neither a reasonable person (a man or woman) nor a man-made system or machine can render a definitive answer to a decision problem given an ***unknown*** or infinite set of possibilities.

2.    Defendants, and principally Defendants Leidos and Cerner, marketed a representation to the DoD for electronic health record (hereinafter "EHR") interoperability, and Leidos entered into a contract with the DoD (hereinafter "DoD EHR Contract") that indicated that EHR interoperability could be achieved with the Department of Defense (hereinafter "DoD"), the Department of Veteran Affairs (hereinafter "VA"), and industry.

3.    More simply, a decision problem can be stated as: "Does a surgeon (a contractor) accept a patient for surgery without X-rays or CT scan or MRI of the injured area?"

4.    Even more simply, a decision problem can be stated as: "Does a building contractor accept a customer for constructing a building without architectural blueprints?"

5.    Regardless of the type of contractor job, whether to operate on a person for medical reasons or construct a man-made system, including the EHR system at the DoD, the contractor requires:

(1) the "current state of the architecture" of the person or man-made system, (2) the "target (or future) state of the architecture", and (3) the transition plan to get from the current state to the target state in compliance with applicable law, rule, and regulation.

6.    If the current state of the architecture is unknown, then a transition plan to a target state cannot be formulated.

7.    If the transition plan cannot be formulated, then the marketing and selling of any manifestation of such a plan must be based on misrepresentations of fact.

8.    That is exactly what Defendant Leidos and its subcontractor Defendants (hereinafter collectively referred to as "Defendants") have done in this case – they made misrepresentations of fact in marketing and selling their transition plan for EHR interoperability with the DoD, VA, and industry.

9.    The misrepresentations of fact require: (1) cancellation of the multi-billion dollar contract awarded to Defendant Leidos, and indirectly to the remaining Defendants, to overhaul, update and manage the DoD EHR Information Technology system, (2) disgorgement of *all* funds paid by the Agency to date to all Defendants under that contract, (3) damages to be assessed against Defendants, jointly and severally, as a result of the false claims made, and (4) full and complete disclosure to the DoD of all misrepresentations involving the requirements so that a new Request for Procurement (hereinafter "RFP") can be issued for full and open competition based on *known* – a finite set of – possibilities in compliance with applicable law, rule, and regulation.

## LAWS OF MATHEMATICS

### The Decision Problem

10.    From mathematical studies starting in high school and into college, and recent movie theatre presentations, students and audiences have been exposed to the laws and theories involving

3

finite and infinite things.

11.    The laws and theories of Computer Science that provide the foundation for practicing Computer Science and Information Technology (hereinafter "IT") professionals (hereinafter "technologists") are rooted in the laws of mathematics as well.

12.    In Computer Science, there is a well-known theory that addresses a set of decision problems involving finite and infinite things to ascertain whether algorithms can *efficiently* be constructed to provide definitive answers to the problems. Construct one efficient algorithm for any one problem involving infinite things, and you have the basis to solve all the problems.

13.    One such decision problem is termed **Linear Bounded Automaton Acceptance**[1]. The problem uses an *alphabet*, a finite set of *elements*, and a *string* composed of any combination of elements from the alphabet. The string can represent anything, meaningful and non-meaningful words, arranged in any manner whatsoever; hence, the string represents an *infinite* set of possibilities. The decision problem, simply stated, is: "Does a finite entity, a man-made system or a reasonable person for that matter, *accept* (or understand) the string?"

14.    To accept the string, there must exist an efficient algorithm that provides a simple, but definitive "yes" or "no".

15.    This decision problem includes the possibility that there is no efficient algorithm that can be constructed to answer the question set forth in paragraph 13 above. In that event, the decision problem is referred to as being "**intractable**".

16.    In the case of the surgeon, consider an alphabet representing the known human organs, diseases, and treatments and the string representing all combinations of this alphabet.

---

[1]    Garey, M.R. and Johnson, D.S. 1979. *COMPUTERS AND INTRACTABILITY. A Guide to the Theory of NP-Completeness*. New York: W.H. Freeman and Company.

17.    In the case of the building contractor, consider an alphabet representing the building materials, plumbing, electrical, HVAC components, tasks and activities, and the string representing all combinations of this alphabet.

18.    As this Complaint involves servicemembers, consider the alphabet and string representing more meaningful information about servicemembers. Let the alphabet represent the set of elements or attributes associated with a servicemember from birth to death.

19.    Examples of elements and attributes are name, age, gender, date of birth, etc. The alphabet forms a finite set. One must describe in what way the element is represented, referred to its "representation type" or simply type. For example, a date can be represented as Feb 1, 2013, 02/01/13, 13/02/01, etc. Thus, the alphabet must include the element type.

20.    Finally, the alphabet also must include the set of elements that represent the tasks and activities for maintaining the servicemember elements. For example, update the servicemember's birthdate, change the home address, etc. The recognizable name for such an alphabet is a dictionary; the alphabet or dictionary is finite. This is no different than for the surgeon or building contractor. Both need to know what it is they will be working on.

21.    A string represents servicemember information, tasks or activities associated with the servicemember information.  The string can result in utter nonsense. Recall the string can be composed from *any* combination of the elements in the alphabet. Thus, the string has an infinite set of possibilities.

22.    Finally, as this lawsuit involves the DoD EHR Contract, let the man-made system represent the DoD EHR IT system that has been marketed and sold to the DoD. The decision problem is then stated as: "Does the DoD EHR IT system accept the string?"

23.    Because the string has an infinite set of possibilities, the problem remains intractable. The

decision problem represents a problem involving EHR interoperability with DoD, VA, and industry.

### Constraining or "Bounding" Infinity

24.     As the decision problem involves finite and infinite sets of elements, to be tractable, an efficient algorithm must be feasible so that it can be performed by a finite man-made machine. To construct such an algorithm, the "technologist" must know **"what"** is in the alphabet and **"what"** is in the string (hereinafter called "the whats"). The technologist can then determine **"how"** the alphabet is represented in the machine, **"how"** the string is represented in the machine, and **"how"** the algorithm is to be efficiently constructed (hereinafter called "the hows"). Thus, the "whats" above must be finite. This is analogous to what a surgeon or building contractor must ascertain in performing their work.

25.     Describing the "whats" is typically the responsibility of the customer. Determining the "hows" is the responsibility of the contractor professional.

26.     A professional *in any field*, not just technology, on being presented with a potential intractable problem has an ethical duty to inform the customer of such a possibility in order to limit or constrain or bound those possibilities.  Only after the customer is informed by the contractor that the possibilities are infinite and are then constrained to be finite can the contractor provide a definitive answer.  For example, for a string representing servicemember information, one decision problem is: "Does man-made system "A" accept the string?" The string can contain medical, education, ancestry, or again, nonsense, and any combination of "what" that was stated above.

27.     Thus, the government contractor professional has an ethical duty to bound the possibilities of the string, effectively making it finite.

28.    It was reported in the online newspaper Military.com on May 1, 2019[2] that

Acting Defense Secretary Patrick Shanahan was grilled by lawmakers Wednesday on the **lengthy and costly effort to develop compatible electronic records systems between the Defense Department and the Department of Veterans Affairs.**" (Emphasis added).

'There's a **degree of inoperability'** between the VA and DoD systems that has defied solution over the years,' Shanahan said. 'The real issue has been [the] passing on of the actual records. I can't explain to you the technical complexity of that.' (Emphasis added).

29.    Simply put, the May 1, 2019 Military.com article highlights the problem just described along with the two analogous examples above: performing a surgery and constructing a building.

30.    Contrary to the Acting Secretary's assertion that the "technical complexity of" the "passing on of the actual records" cannot be explained, the problem *can* be explained and is rather straightforward.

31.    Defendants, or one or more of them, misrepresented their abilities to create a transition plan for the DoD to not only make DoD EHRs "compatible", also known as "intra-operable", but also in allowing EHRs between the VA, DoD and private medical service providers to be "interoperable."

32.    Defendant Leidos and Cerner's representations about their respective and joint successful deployments to commercial customers persuaded the DoD to award an EHR contract to Leidos (hereinafter the "DoD EHR Contract").

33.    It was based, in part, on Defendant's representations about their respective core businesses in integrating their respective product suites into a customer's environment and that they could

---

[2]    Sisk, R. *VA, DoD Electronic Health Records Still Aren't Compatible, and Lawmakers Are Angry* at https://www.military.com/daily-news/2019/05/01/va-dod-electronic-health-records-still-arent-compatible-and-lawmakers-are-angry.html#.XMpPxUvg0QA.email. May 1, 2019.

achieve the same between the DoD and VA that the DoD decided to award Defendant Leidos the DoD EHR Contract as prime contractor.

34.    It was based on the DoD's market research in the IT industry that the DoD decided to award Defendants a contract through Leidos for the full scope of services and products necessary to deploy the DoD EHR solution in a manner that meets the needs of the DoD.

35.    At or about the time that the DoD EHR Contract was awarded, the DoD did not have the human resources necessary—the technical data or the detailed knowledge to perform the requirements to make the DoD EHR IT system interoperable.

36.    In 2012, Nextgov reported Leidos, under its prior name Science Applications International Corporation ("SAIC"), was awarded a sole source contract to maintain the Composite Health Care System ("CHCS"),[3] a precursor to the legacy DoD EHR system being replaced currently by Defendants MHS GENESIS.

37.    Nextgov referenced the sole source justification for Leidos (previously SAIC)[4] for this CHCS contract award. The justification stated that in 1988, Leidos was awarded a contract to design and develop CHCS and further specified Leidos' expertise for the award.

> Today, SAIC continues in the sustainment role and is the ***only vendor capable of supporting functional and technical system changes*** due to their unique experience and familiarity with the system.  SAIC will continue to provide engineering, logistics and sustainment support for CHCS, supporting over 9.4 million beneficiaries of the Military Health System TRICARE Program.  In addition, SAIC has developed a government functional support infrastructure that is highly specialized and operated by SAIC personnel only; … ***There is no other vendor that can provide the type and level of support required for these tasks.*** [(Emphasis added).]

---

[3]    Brewin,    B.    Nextgov.    *SAIC    Wins    More    TRICARE    Business*    at https://www.nextgov.com/defense/whats-brewin/2012/02/saic-wins-more-tricare-business/55172/. February 6, 2012.

[4]    FedBizOpps. *70—Limited Source Justification – FAR 8.405-6 Only One Source. Award Number N62645-12-F-0017 at* https://www.fbo.gov/index?s=opportunity&mode=form&tab =core&id=b0adbf52c9c358a80e6cc92ea9e8c4d0. February 1, 2012.

38.    In 2009, Leidos announced it had been awarded a task order to maintain the Armed Forces Health Longitudinal Technology Application ("AHLTA")/CHCS.[5] AHLTA/CHCS over the course of twenty-seven years eventually became the DoD EHR system now being replaced by MHS GENESIS in the DoD EHR Contract.

39.    PIIM Research provided a contextual history and timeline up to 2008[6] on the evolution of the DoD EHR system.

40.    In 1989, the U.S. Government Accountability Office ("GAO") identified DoD's reliance on Leidos as well as *Leidos' limited experience* in undertaking the CHCS effort.[7]

41.    In a 1992 GAO report on CHCS, the GAO identified a key issue that arises when information is supplied that leaves the door open to infinite possibilities if not properly constrained – the existence of multiple patient records arises, which is then a threat to a patient's safety.[8]

42.    A 1993 GAO report marks an entry into the concept of information sharing, also known as data interoperability.[9]  In this report, the GAO identified a number of barriers, however, the decision problem associated with infinite possibilities was not one of them; only the technologists

---

[5]    Leidos. *SAIC awarded $158 Million task order by Defense Health Information Management System* at https://investors.leidos.com/news-and-events/news-releases/press-release-details/2009/SAIC-Awarded-158-Million-Task-Order-by-Defense-Health-Information-Management-System/default.aspx. May 6, 2009.

[6]    Yoshida, S. and Bacon, B. *The Parsons Institute for Information Mapping. Contextual History and Visual Timeline of AHLTA and VISTA/CPRS Products* at http://piim.newschool.edu/_media/pdfs/PIIM-RESEARCH_AHLTA_VISTA_History.pdf. October 30, 2008.

[7]    GAO/IMTEC-89-30. *MEDICAL ADP SYSTEMS. Composite Health Care System Operational Tests* at https://www.gao.gov/assets/220/211112.pdf. April 1989.

[8]    GAO/IMTEC-98-11 *COMPOSITE HEALTH CARE SYSTEM. Outpatient Capability Is Nearly Ready for Worldwide Deployment* at https://apps.dtic.mil/dtic/tr/fulltext/u2/a259230.pdf. Dec 1992.

[9]    GAO/IMTEC-93-33BR. *FEDERAL HEALTH CARE. Increased Information System Sharing Could Improve Service, Reduce Costs* at https://www.gao.gov/assets/80/78677.pdf. June 1993.

would understand this scenario arising.

43.     Fast-forward to the 2014, a GAO report on EHRs was issued, in which interoperability was identified as not being achieved.[10] The Report includes an historical perspective on interoperability, but not the decision problem.

44.     As of May 2019, it has been over thirty-one (31) years since Leidos was awarded the initial contract for CHCS, and the risk of infinite possibilities in the decision problem remains unsolved.

45.     Given the DoD's stated lack of core competencies to perform the requirements to make its EHRs intra-operable and interoperable, the DoD was required to rely on government contractors, including Defendants Cerner and Leidos and/or the other Defendants, to apply their represented current "expertise" in achieving interoperability to solve the EHR IT decision problem.

46.     Given the DoD's stated lack of core competencies to perform the requirements to make its EHRs intra-operable and interoperable, the DoD had to rely on Defendants Leidos and/or Cerner and/or the other Defendants to technically advise on the effort to draft the requirements for its procurement contract for the DoD EHR Contract.

47.     Defendant Leidos and/or Defendant Cerner provided the technical expertise to the DoD to build contract requirements as a result of the fact that DoD federal employees were not the technical experts to understand what is and is not required to build an IT system.

48.     Defendants, or one or more of them, were required to comply with the technical standards at 40 U.S.C. §11312, Capital Planning and Investment Control, and the Office of Management and Budget (OMB) Circular A-130, Management of Federal Information Resources, November 28, 2000, in technically advising on the contract requirements for the DoD EHR Contract.

---

[10]     GAO-14-302. *ELECTRONIC HEALTH RECORDS. VA and DOD Need to Support Cost and Schedule Claims, Develop Interoperability Plans, and Improve Collaboration* at https://www.gao.gov/assets/670/661208.pdf. February 2014.

49.     Defendants, or one or more of them, are required to comply with the technical standards at 40 U.S.C. §11312, Capital Planning and Investment Control, and the Office of Management and Budget (OMB) Circular A-130, Management of Federal Information Resources, November 28, 2000, in performing under the DoD EHR Contract.

50.     Defendants, and principally Defendants Leidos and Cerner, marketed to the public, DoD (and the VA) through their many representations that they had the present ability and present expertise to achieve intra- and interoperability with a unified DoD EHR IT system called "Millennium" across the entire DoD healthcare system.

51.     It is based on these representations, which were, in fact, *misrepresentations*, that the DoD EHR Contract was awarded and signed by the DoD.

52.     Defendants, or one or more of them, fraudulently induced the DoD to award Leidos a contract based on the representations that they, or one or more of them, could achieve intra- and interoperability with DoD's EHRs.

53.     Defendants, or one or more of them, fraudulently induced the DoD to award Leidos a contract based on the representations that they, or one or more of them, could achieve intra-operability within the DoD and interoperability with the VA and the private sector and industry.

54.     Defendants, or one or more of them, fraudulently induced the DoD to award Leidos a contract based on the representations that they, or one or more of them, were in the process of achieving intra- and interoperability with DoD's EHRs.

55.     Defendants', or one or more of their, representations to the DoD, in an effort to induce the DoD to have *confidence and trust* in Defendant Leidos as its prime contractor to enter into the DoD EHR Contract, were false because Defendants, or one or more of them, had an ethical duty to technically advise the DoD of the unbounded, infinite possibilities, given that the "whats" of

the elements of the EHR alphabet (and associated dictionary) and strings of elements (the "whats" being defined in paragraph 13 above) were not sufficiently provided in the DoD's Request for Procurement ("RFP").

56.     The ethical obligation of Defendants, or one or more of them, to inform the DoD, the customer, of the "whats" is no different than for a surgeon or a building contractor.

57.     Without constraining infinity in the DoD's EHR decision problem, Defendant Leidos' purported "transition plan" under the DoD EHR Contract – its software technology offering – does not bound costs, making costs infinite and uncontrollable.

58.     Without constraining infinity in the DoD's EHR decision problem, Defendants, or one or more of them, must "shoot in the dark" across infinite possibilities.

59.     Without constraining infinity in the DoD's EHR decision problem, Defendants, or one or more of them, must proceed through a trial and error process across infinite possibilities, making the DoD's EHR IT decision problem intractable and therefore unsolvable in a finite period of time.

60.     Taxpayers should not be required to pay Defendants to accept infinite possibilities for a problem, such that it can never be solved in a finite period of time.

61.     A properly awarded government contract based on finite, not infinite, requirements in the transition plan will move the DoD to a "future state" EHR system that is both intra-operable throughout the entire DoD healthcare system and interoperable between the VA, DoD and private medical service providers serving veterans.

62.     It is for that reason, among others, that Plaintiff/Relator brings this *qui tam* action: to stop the hemorrhaging before more taxpayer dollars are wasted and to mitigate a substantial and specific danger to public health in trying to solve for infinite possibilities in the DoD EHR Contract requirements.

## THE PARTIES INVOLVED

63.     Plaintiff/Relator Eugene J. Guglielmo, Ph.D. resides at 5825 Edgehill Drive, Alexandria, Virginia 22303. Relator has over 30 years of experience in man-machine and machine-machine interoperability technology implementations. Relator is a U.S. Citizen.

64.     Defendant Leidos, Inc. ("Leidos"), http://www.leidos,com/, has its headquarters located at 11951 Freedom Drive, Reston, Virginia 20190.  Leidos is a "core team" prime contractor under the DoD EHR Contract. Leidos is a global science and technology company that provides technology and engineering services and solutions in the defense, intelligence, civil and health markets.

65.     Defendant Cerner Corporation (hereinafter "Cerner"), http://www.cerner.com, has its headquarters located at 2800 Rockcreek Parkway, North Kansas City, Missouri 64116, and is a publicly traded company on the Nasdaq under the initials "CERN".  Cerner develops components of a Health Network Architecture ("HNA"), an integrated information technology ("IT") system designed to automate health care processes.  Cerner is a "core team" subcontractor of Leidos under the DoD EHR Contract.

66.     In 1997, Cerner introduced Cerner "Millennium", an upgrade to its HNA system which incorporated all of the company's software offerings into one unified computer architecture.

67.     Defendant Accenture, https://www.accenture.com/us-en, has its headquarters in Dublin, Ireland. Accenture PLC is publicly traded under "ACN" on the NYSE. Accenture is a global management consulting and professional services firm that provides strategy, consulting, digital, technology and operations services. Accenture is a "core team" subcontractor of Leidos under the DoD EHR Contract.

68.     Defendant Henry Schein, Inc., https://www.henryschein.com/, is located at 135 Duryea

13

Road, Melville, New York 11747. The company is publicly traded under "HSIC" on Nasdaq. Henry Schein Inc. is a distributor of health care products and services with a presence in 34 countries. Henry Schein, Inc. is a "core team" subcontractor of Leidos under the DoD EHR Contract.

## JURISDICTION AND VENUE

69.    Plaintiff/Relator hereby alleges causes of action under 31 U.S.C. sections 3729 *et al.* of the False Claims Act, arising from Defendants' contracts with the United States Government, Department of Defense.

70.    Relator is an "Original Source" with direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived from his 30 years of experience as a Computer Scientist, of the information on which the allegations set forth in this Complaint are based, and has voluntarily provided the information to the Government prior to the filing of this Complaint.

71.    None of the allegations set forth in this Complaint are based on any public disclosure of information or transactions in a civil, criminal, or administrative hearing in which the Government is a party, in a congressional, administrative, or Government Accountability Office Report, hearing, audit, or investigation.

72.    Pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3729 et seq., Relator's statements have been filed with the Office of Special Counsel, Department of Justice and the United States Attorney's office.

73.    Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732, 28 U.S.C. § 1331 and 28 U.S.C. § 1345 in that this action arises under the laws of the United States.

74.     Defendants are technologists in the business of providing IT and healthcare-related services and material to the Government through the DoD and conduct business in the District of Columbia.

75.     Presentment to the United States has been made under the DoD's DoD EHR Contract with the United States Government, Contract No. N00039-15-D-0044, awarded on or about July 29, 2015.

76.     The DoD EHR Contract was modified on or about August 2, 2018 to add approximately $1.1 billion to include the U.S. Coast Guard under that DoD EHR contract.

77.     Presentment to the United States has been made under the DoD's DoD EHR Contract with the United States Government for the U.S. Coast Guard, Contract No. N00039-15-D-0044b, awarded on or about August 2, 2018.

78.     Venue and jurisdiction are proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732 as the Defendants are a group of organizations and persons subject to personal jurisdiction in the District of Columbia.

79.     Venue is also proper in this judicial district pursuant to 31 U.S.C. 3730(a) because each of the Defendants can be found in or has transacted business in the District of Columbia, and many of the alleged acts occurred in this judicial district. Defendants conduct business in this judicial district. DoD contracts with IT and healthcare-related firms, such as Defendants' firms, are approved, executed and funded through governmental offices in this judicial district.

### Dr. Eugene Guglielmo Is The Original Source Of Material Information Giving Rise To This Lawsuit

80.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

81.     Dr. Guglielmo was employed by the U.S. Department of the Navy ("DoN") from 1985 to

1994. During his employment, he obtained a Ph.D. in Computer Science, specializing in intelligent information storage and retrieval. During that time, he implemented man-machine interoperability using natural language for multimedia data.

82.     Dr. Guglielmo worked for the DoN in the competitive service and then later for the DoD as a contractor for a combined total of nearly fourteen (14) years.

83.     At the Monterey Bay Aquarium Research Institute from 1994 to 1996, Dr. Guglielmo implemented man-machine and machine-machine interoperability for scientific deep-sea missions.

84.     At BEA Systems from 1996 to 1999, Dr. Guglielmo implemented the transactional processing framework for the emerging service-oriented architecture ("SOA") machine-machine interoperability technology for the marketplace.

85.     As an independent consultant and then Chief Information Officer at SilTerra Malaysia from 2000 to 2003, Dr. Guglielmo implemented machine-machine interoperability between the enterprise resource planning ("ERP") system and manufacturing execution system ("MES") for real-time shop floor work-in-progress.

86.     At the DoD from  2008 to 2013, Dr. Guglielmo architected the design and oversaw implementation of machine-machine interoperability affecting 50 million DoD affiliates, including servicemembers, their beneficiaries and all of the VA's veterans, in support of the DoD's human resource management ("HRM"), person identity, decision support, and personnel security mission.

87.     Specifically, he architected for interoperability across the DoD HRM systems.

88.     Dr. Guglielmo personally designed the interoperability technology that is now the foundation for the Defense Enrollment and Eligibility Reporting System ("DEERS") managing HRM data for 50 million DoD "affiliates" (servicemembers, veterans, reserve, national guard, families, contractors, foreign nationals, etc.) to exchange information with the future Joint

Personnel Adjudication System ("JPAS") managing security clearances for 11 million affiliates, and other federal and industry IT systems needing the HRM data.

89.    At DoD, he identified the interoperability problem that defied a solution for over a decade and was given the customer's "whats" (as defined in a paragraph 24 above) to transform them into the "hows" (also defined in a paragraph 24 above) of the technology to allow approximately 300 services, including services that support the VA, to interoperate with one another.

90.    Essentially, Dr. Guglielmo bound the IT decision problem using a finite, not infinite, set of possibilities. The technology is called the "Common Update Framework" (or "CUF") and was presented at the DoD Personnel & Readiness Information Management HRM Enterprise Architecture ("EA") Forum in the Summer of 2011 for both Government and public review.

91.    After he designed the CUF at DoD, private contractors (including but not limited to SRA (now CSRA), Hewlett Packard, Northrop Grumman and other small businesses) implemented the design across the HRM systems at the Defense Manpower Data Center ("DMDC").

92.    The CUF allows interoperability of HRM, person identity, security clearance, insurance, medical, and other data to enable storage and retrieval ("push" and "pull" tasks) in accordance with enterprise data governance and data quality requirements.

93.    In 2015, the VA hired Dr. LaVerne Council as its Assistant Secretary and Chief Information Officer ("CIO") under the VA Secretary to head the VA Office of Information & Technology ("OI&T").

94.    On October 30, 2016, the VA, upon the recommendation of VA CIO Council, hired Dr. Guglielmo, and he reported directly to her.

95.    Dr. Guglielmo was hired at the VA because, according to Dr. Council, "No one knew computer management better than Dr. Guglielmo."

96.     With the approval of the VA CIO, Dr. Guglielmo undertook the strategy to bring the DoD CUF to the VA.

97.     Dr. Guglielmo was employed at the VA from October 30, 2016 to May 19, 2017.

98.     At the VA, Dr. Guglielmo was Senior Advisor for Health Data Management ("SAHDM"), the Senior Executive Service ("SES") accountable executive for establishing the tactical and strategic direction in the areas of health information management.

99.     Dr. Guglielmo also served in the capacity as the VA's Deputy Chief Information Officer ("DCIO") for Enterprise Data Management (hereinafter "EDM"), the SES accountable executive for establishing the tactical and strategic direction in information management for *all* VA data.

100.    Dr. Guglielmo's work entailed interoperability and intra-operability of all data for the VA, including the EHRs throughout the VA healthcare system.

101.    In 2016, the VA Secretary unveiled his "Breakthrough Initiative on EDM."

102.    The VA Secretary's Initiative was discussed publicly in the executive and legislative branches and with the media.

103.    That Initiative required advanced planning to look at all electronic data throughout the VA in order to develop a comprehensive and coordinated strategy and make the exchange of all data fully intra-operable throughout the VA health system and interoperable between the health systems of the VA, DoD and private medical service providers.

104.    Dr. Guglielmo was identified at the VA as the technical "subject matter expert" for that Initiative representing the VA OI&T.

105.    In addition, from his years working at the DoD and in the private sector, Dr. Guglielmo was well versed and adhered to federal law, rules, and regulations operationalizing the Clinger-Cohen Act of 1996 in designing DoD's IT HRM data management systems, including DEERS.

106.    At DoD, he successfully shepherded the initiative to make DoD's HRM records intra-operable within the DoD (through its DEERS system) in compliance with the DoD Architecture Framework ("DoDAF"), operationalizing Clinger-Cohen Act requirements.

107.    Dr. Guglielmo's duties of his combined VA SAHDM and DCIO positions, among others, were to develop the strategy, guidance, implementation and management governance for the VA's future technology environment, including its VA's EHR IT systems.

108.    His duties were to support the VA's overall mission and strategy to meet emerging business needs to better service veterans by creating and implementing a more effective and efficient unified enterprise IT system to meet those needs.

109.    The VA's mission to meet those business needs required balancing against the need to maintain a consistent approach to the VA's IT system and software development lifecycles so that those systems did not become obsolete over time.

110.    As VA SAHDM, Dr. Guglielmo was the accountable executive for establishing the tactical and strategic direction in the areas of health information management; business intelligence analytics and analytic technologies; and assessment of data quality and consistency across the VA's "Next Generation Digital Health Platform" (its EHR modernization effort) to support  four core business areas: (1) clinical care management, (2) clinical operations management, (3) veteran engagement, and (4) veteran health analytics.

111.    As VA DCIO EDM, he was the accountable executive to provide tactical and strategic direction in the areas of information management; business intelligence analytics and analytic technologies; data management, mining, and warehousing; and assessment of data quality and consistency across platforms, products, and geographical areas.

112.    From January to May 2017, Dr. Guglielmo successfully steered the VA Secretary's EDM

Breakthrough Initiative to develop business requirements to constrain infinity, that is, constrain the infinite set of possibilities to a finite set for the IT decision problem.

113.    Dr. Guglielmo's effort along with his team was undertaken in order to pursue a "divide-and-conquer" strategy for constraining infinity and to undertake the "incremental development" approach and certification process required by federal law so that the VA's EHR IT system components would be replaced without compromising the integrity of the EHRs, as required by the Privacy Act, 5 U.S.C. § 552a.

114.    On May 17, 2017, Dr. Guglielmo received instructions from the Secretary's EDM Initiative contact representing VA Acting Deputy Secretary Scott Blackburn to develop the 30-, 60-, and 90-day CUF plans for EHR, financial, and benefit data.  This effort would allow the VA to initiate the development of the EHR IT system "transition plan", in compliance with federal law requirements.

115.    On May 19, 2017, to his surprise, Dr. Guglielmo's employment with the VA was abruptly terminated by the VA Acting CIO Rob Thomas II.

116.    Eleven (11) days after his termination, VA Secretary Dr. David Shulkin issued his "Determinations and Findings" ("D&F") on June 1, 2017 to justify his decision to award to Defendant Cerner on a sole source basis a government contract to overhaul, upgrade and manage the VA's EHR IT system using the same system as the DoD EHR IT system under the DoD EHR Contract that was awarded to Defendant Leidos approximately two years earlier.

## STATUTORY AND REGULATORY BACKGROUND

### The False Claims Act And Contracting Requirements

117.    The False Claims Act ("FCA") prohibits knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment for approval.  31 U.S.C. § 3729(a)(l)(A).

118.    Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement (a) to get a false or fraudulent claim paid or approved by the federal government (or a government contractor, if the money to pay the claim comes from the government) or (b) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the federal government. 31 U.S.C. §§ 3729(a)(l)(B), 3729(a)(l)(G), 3729(b)(2)(A).

119.    The FCA also prohibits persons from conspiring to commit violations of the FCA. 31 U.S.C. § 3729(a)(l)(C).

120.    To ensure the integrity of its acquisition and contracting processes, the United States Government enacted certain provisions of the Federal Acquisition Regulation (the "FAR"), codified in Title 48 of the Code of Federal Regulations.

121.    These codified standards are based upon a rich history of legislative intent and regulatory emphasis designed to ensure the open and unadulterated acquisition of goods and services by the United States Government and safeguarding the Treasury, and ultimately the taxpayers, from the harm effectuated by fraudulent procurement.

122.    The U.S. Government requires that the contractors with whom it does business "*conduct themselves with the highest degree of integrity and honesty.*" 48 C.F.R. § 3.1002 (emphasis added).

123.    One explicit - and obvious - component of that requirement is that federal government contractors shall not engage in fraudulent practices or make misrepresentations to fraudulently induce the U.S. Government to enter into contracts with the contractor and/or to conceal or fail to report fraud and/or violations of the False Claims Act. 48 C.F.R. § 52.203-13.

124.    The FAR further provides that the Government may suspend or disbar a contractor for

the "knowing failure by a principal to timely disclose to the Government ... credible evidence of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States code or *a violation of the civil False Claims Act*." 48 C.F.R. § 52.203-13 (emphasis added).

125.    In addition, the Government's policy is "that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contractors." 48 C.F.R. § 6.101. The FCA imposes liability and penalties on all claims submitted under Government contracts that were fraudulently induced.

**The Clinger-Cohen Act and Associated Rules And Regulations Require That IT Specifications Be Set Forth In An IT Acquisition Government Contract**

126.    The July 1, 2004 Office of Management and Budget ("OMB") Memorandum M-04-16 *Software Acquisition* reminds agencies of policies and procedures to support agency IT operations. The memorandum states:

> These policies are intentionally technology and vendor neutral, and to the maximum extent practicable, agency implementation should be similarly neutral. As this guidance states, all agency IT investment decisions, including software, must be made consistent with the agency's enterprise architecture and the Federal Enterprise Architecture.

127.    The DoD EHR Contract is a software acquisition contract.

128.    The OMB M-04-16 *Software Acquisition* requires agencies to undertake software acquisitions that are consistent with, and comply with, the Enterprise Architecture ("EA") of the given agency and the Federal Enterprise Architecture ("FEA") across the entire U.S. Government.

129.    The Information Technology Management Reform Act of 1996 ("ITMRA") and the Federal Acquisition Reform Act ("FARA") (also known collectively as the "Clinger-Cohen Act of 1996," which is codified in 40 U.S.C. § 1401 *et seq.*) created a wide array of responsibilities for federal agency Chief Information Officers ("CIOs"), including developing strategies and specific

plans for hiring, training and professional development of the IT workforce.

130.    In addition, the ITMRA directs federal agencies to focus more on the results achieved through IT investments while streamlining the federal IT procurement process. Specifically, the ITMRA emphasizes rigor and structure in how agencies approach the selection and management of IT projects.

131.    The Clinger-Cohen Act reflects statutory and regulatory requirements, as well as areas requiring greater emphasis due to new policies and strategies (e.g., President Obama's strategy on digital government), continuous changes in technology, and other evolving agency IT/cybersecurity mission requirements.

132.    In 2012, new IT competencies were added as requirements under the Clinger-Cohen Act involving, among other topics, IT governance, IT program management leadership, vendor management, cybersecurity/information assurance strategies and plans, cloud computing, open government, information collection, and information accessibility.

133.    Specifically, the "CIO Council", which is comprised of the CIOs from twenty-eight (28) federal executive agencies, published the "2012 Clinger-Cohen Competencies & Learning Objectives" ("CCC&LO").

134.    Defendants are required to comply with the requirements of the Clinger-Cohen Act.

135.    The CCC&LO references the OMB Circular A-130, which operationalizes and implements Clinger-Cohen Act requirements.

136.    The OMB Circular A-130 shall "apply to the information resources management activities of all agencies of the Executive Branch of the Federal Government." OMB Circular A-130 at 3.

137.    The OMB Circular A-130 further provides:

>    Agencies *shall* establish a comprehensive approach to improve the *acquisition* and management of their information resources by: performing information resources

management activities in an efficient, effective, economical, secure, and privacy-enhancing manner; focusing information resources planning to support their missions; implementing an IT investment management process that links to and supports budget formulation and execution; and rethinking and restructuring the way work is performed before investing in new information systems.   OMB Circular A-130 at 4 (emphasis added).

138.    The OMB Circular A-130 requires that federal agencies create and inventory their existing IT "enterprise architecture" ("EA") *before* proceeding with a transition plan to update and create a future IT system.

139.    In particular, the OMB Circular A-130 provides:

> Agencies *shall develop an enterprise architecture (EA) that describes the baseline architecture, target architecture, and a transition plan to get to the target architecture*. The agency's EA shall align to their IRM [("Information Resource Management")] Strategic Plan. The EA should incorporate agency plans for significant upgrades, replacements, and disposition of information systems when the systems can no longer effectively support missions or business functions. The EA should align business and technology resources to achieve strategic outcomes. The process of describing the current and future state of the agency and laying out a plan for transitioning from the current state to the desired future state, helps agencies to eliminate waste and duplication, increase shared services, close performance gaps, and promote engagement among Government, industry, and citizens.  [(OMB Circular A-130 at §5(a)(2) (emphasis added).]

140.    The OMB Circular A-130 requires federal agencies, including the DoD, to plan, program and budget development and maintenance of IT resources. OMB Circular A-130 at 4-20.

141.    Since OMB Circular A-130 requires the Agency to plan, program and budget development and maintenance of IT resources, the DoD was prohibited from contracting out to outside IT contractors to perform that function without close DoD management, supervision and technical competencies to oversee that contractor effort.

142.    The CCC&LO at § 11.0 entitled "Enterprise Architecture" references the Federal Enterprise Architecture ("FEA"). The FEA, and its associated Framework ("FEAF"), identifies five reference models: Performance, Business, Data, Application, and Infrastructure.

143.    The FEAF reference to "Data" includes "common semantic and syntactic information (e.g., a data dictionary)," the elements of the alphabet defined in paragraph 13 above, as it pertains to EHR data.

144.    The FEA's Data Reference Model ("DRM") addresses business-focused *data standardization* and cross-agency information exchanges affecting the EHR data, also called "intra-operability" and "interoperability." CCC&LO § 11.5 at p.59 (emphasis added).

145.    The DRM falls under CCC&LO § 11.5 entitled "Enterprise Data Management," or EDM.

146.    The DoD has a FEAF to meet its own business needs called "DoD Architecture Framework" ("DoDAF").

147.    The DoDAF analogy to the FEA Data Reference Model (DRM) is the "Data and Information Viewpoint" ("D&IV").

148.    The DoD has further created the Business Architecture Framework ("BEA") that identifies a subset of the DoDAF viewpoints (which include elements and strings, as defined in paragraph 13 above) to create a vendor-neutral set of viewpoints to describe the *finite* set of information to allow DoD to undertake a business transformation from baseline or current enterprise architectures to target or future enterprise architectures.

149.    In 2014, Congress passed the Federal Information Technology Acquisition Reform Act ("FITARA") to put agency CIOs in charge of IT investments.

150.    Under FITARA at § 102(a)(3), the DoD CIO is required to certify the accuracy of the information and data contained in the bounded set of elements and strings (as defined in paragraph 13 above) to be included in the new DoD IT system architecture.

151.    OMB A-130(5)(a)(2) states that the EA requires a baseline (current) architecture to identify the starting point for creating a Transition Plan to the future (target) architecture.

152.    As the current/baseline DoD EA (documented using the DoDAF) is not included in the DoD EHR Contract's RFP as bounded, the Federal Enterprise Architecture Data Reference Model ("FEA DRM") is also not bounded.

153.    The DRM and D&IV contain the information to constrain the element and string information identified and defined in paragraph 13 above.

154.    Defendants did not technically advise the DoD that the "whats" contained in the FEA DRM and DoDAF D&IV needed to be explicitly stated and made finite prior to issuance of the RFP.

155.    Otherwise, the decision problem is intractable, making interoperability intractable.

156.    Software development involves technical expertise in writing efficient algorithms to solve Computer Science decision problems.

157.    Hence, the technical burden fell on the technologists, the Defendants to, construct the DoD EHR Contract technical IT requirements.

158.    Defendants, or one or more of them, did not disclose and/or provide technical advice to the DoD that there were performance constraints for the EHR Modernization effort.

159.    The acquisition of the DoD's commercial off-the-shelf ("COTS") EHR solution for the DoD did not delve into the intractable nature in the design of systems to achieve interoperability.

160.    Defendants, or one or more of them, did not disclose and/or provide technical advice to the DoD that intra- or interoperability was a risk associated with the DoD EHR Contract.

161.    Compliance with federal law, rule, and regulation as well as Agency rules and regulations is a safeguard to constraining infinity for the decision problem and avoiding infinite cost.

162.    Defendants are required to comply with federal law, rule, and regulation in implementing the DoD EHR Contract.

163.    Defendants were required by federal law, rule, and regulation to disclose any known

deficiencies in the current/baseline EA prior to entering into the DoD EHR Contract.

## STATEMENT OF FACTS

### Background About The DoD EHR Contract For MHS GENESIS

164.    The DoD Healthcare Management System Modernization ("DHMSM") program was established to support the May 21, 2013 Secretary of Defense memorandum mandating DoD to competitively select a configurable, scalable, and modernized Off-the-Shelf ("OTS") EHR IT System.

165.    As directed by the Under Secretary of Defense for Acquisition, Technology, and Logistics Acquisition Decision Memorandum dated June 21, 2013, the DHMSM Program Management Office ("PMO") was chartered to manage the acquisition and implementation of the DoD's OTS EHR System.

166.    On or about September 2014, the Defense Healthcare Management Systems Program Executive Office issued a Request for Proposals regarding the DoD EHR IT System, which is Solicitation Number N00039-14-R-0018.

167.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number N00039-14-R-0018 regarding the DoD EHR IT System, "[t]he Department of Defense (DoD) Military Health System (MHS) has multiple legacy healthcare systems and data stores, developed over decades, which need to be modernized. This modernization must ensure and enable sustainability, flexibility, and *interoperability* of the MHS while improving the continuity of patient care." (Page 1, emphasis added).

168.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number

N00039-14-R-0018 regarding the DoD EHR IT System, "[t]he EHR System will leverage data exchange capabilities in alignment with the Interagency Program Office (IPO) for standards-based health data *interoperability* and secure information sharing with external partners to include the VA." (Page 2, emphasis added).

169.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number N00039-14-R-0018 regarding the DoD EHR IT System, "[t]he system must continuously provide survivable, *interoperable*, secure, and operationally effective information exchanges to enable a net-centric military capability." (Page 3, emphasis added).

170.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number N00039-14-R-0018 regarding the DoD EHR IT System, "[t]he contractor shall provide an EHR System (integrated inpatient/outpatient Best of Suite (BoS) solution, augmented by Best of Breed (BoB) products) that meets or exceeds all requirements in the Government RTM…." (Page 33)

171.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number N00039-14-R-0018 regarding the DoD EHR IT System, "[t]he Government Requirements Traceability Matrix (RTM) defines the technical parameters to enable the EHR System to support DHMSM functional capabilities." (Page 1)

172.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number N00039-14-R-0018 regarding the DoD EHR IT System, "[t]he EHR System shall: … Provide *interoperable*, secure, and operationally effective information exchanges to enable a Net-Centric

military capability in compliance with DoD Instruction 'Sharing Data, Information, and Information Technology (IT) Services in the Department of Defense' (DODI 8320.02)." (Page 33, emphasis added).

173.    As set forth in the DoD's Indefinite Delivery/Indefinite Quantity ("IDIQ") Performance Work Statement ("PWS") issued as part of its Request for Proposals for Solicitation Number N00039-14-R-0018 regarding the DoD EHR IT System, the contractor shall provide assessments of interoperability.  (Page 34).

174.    From FY2008 to FY2015, USASpending.gov identified sixteen (16) contracts awarded to Defendant Cerner, of which twelve (12) required EA (DoDAF) and FEA related tasks.

175.    From 1988 to the present, the GAO and DoD identified Defendant Leidos' responsibilities for the design, creation, and sustainment of the legacy DoD EHR system being replaced by the DoD EHR Contract, all of which requires compliance with EA (DoDAF) and FEA related tasks for proper documentation.

176.    As the government contracts referenced in the preceding paragraphs affect IT investments, in accordance with OMB M-04-16 *Software Acquisition,* "all agency IT investment decisions, including software [and the target DoD EHR IT system], must be made consistent with the agency's enterprise architecture and the Federal Enterprise Architecture [FEA]."

177.    Given that the contractors had the technical competency and were given technical competency responsibilities under contract, the contractors had a ***duty,*** pursuant to the Business Ethics Code set forth in the Code of Federal Regulations as well as other federal regulations, to disclose honestly and truthfully that the current/baseline EA (DoDAF) and FEA documentation was insufficient to support a competitive RFP.

178.    Given that the contractors had the technical competency and were given technical

competency responsibilities under contract, the contractors had a ***duty***, pursuant to the federal Business Ethics Code set forth in the Code of Federal Regulations as well as other federal regulations, to disclose honestly and truthfully that the ***DoD's current/baseline EA (DoDAF) and FEA were unknown such that it neither constrained for infinity of elements nor strings*** (as defined in Paragraph 13 above).

179.    As the contractors had the technical competency and were given technical competency responsibilities under contract, the contractors had a ***duty***, pursuant to the Business Ethics Code set forth in the Code of Federal Regulations as well as other federal regulations, to deliver their work for incorporation into the EA (DoDAF) and FEA documentation repository to support a competitive RFP.

180.    Hence, any DoD decisions for a software acquisition prior to July 2015 could only be consistent with individual contractor's information and not the EA (DoDAF) and FEA, as required by federal law.

181.    The information contained in the EA (DoDAF) and FEA is critical to constraining infinity.

182.    As the DoD EA (DoDAF) and FEA itself was unknown prior to July 29, 2015, infinity could not be bounded, making intra- and interoperability intractable.

183.    During the time period of 2014-2015 prior to the July 29, 2015 DoD award of the DoD EHR Contract, Defendant Leidos was maintaining the DoD EHR system.

184.    Defendants, or one or more of them but principally Leidos and Cerner, represented to the DoD during the time period of 2014-2015 prior to the July 29, 2015 DoD award of the DoD EHR Contract their respective and joint proven expertise in achieving interoperability.

185.    Defendants' (or one or more of them but principally Leidos and Cerner) representations about their proven expertise in achieving interoperability allowed them to compete for the DoD

$4.3 billion contract awarded in 2015.

186.    Defendants' (or one or more of them but principally Leidos and Cerner) representations about their expertise, among other areas, in achieving interoperability allowed them to induce the DoD to select them for the $4.3 billion DoD EHR Contract.

187.    The DoD awarded a $4.3 billion contract to Leidos to deliver a modern system with full deployment across the DoD Military Health System ("MHS"). The DoD EHR system, now known as MHS GENESIS, at its core consists of *Cerner Millennium*, a commercial EHR system developed by Defendant Cerner, integrated with a number of ancillary products to provide dental capabilities, reporting, population management, and backend application support. (Emphasis added).

188.    The DoD contract with Leidos also includes several services, such as hosting, integration, organizational change management, cybersecurity, and training.

189.    The DoD EHR IT system, if it has only one system, is both the "solution architecture" and the Enterprise Architecture ("EA") for the DoD EHR system.

190.    If the DoD EHR system has more than one IT system, then each IT system has a "solution architecture," and all systems combined are governed by one EA for the DoD EHR system and are connected by a common interoperability, for example, a cable connecting the systems using a common protocol. Otherwise, the IT systems cannot communicate with one another.

**Defendants Market Interoperability And Their Expertise to the Public and Government**

191.    Defendants are software product and/or software service companies.

192.    As a software product company, Defendant Cerner's solution for the marketplace was defined by its *proprietary* solution architecture.

193.    Defendant Leidos is a system integrator who takes a given software product and integrates

31

it into a customer's environment.

194.    In marketing their IT solutions to the public both prior to and after July 2015, Defendants, or one or more of them, as solution providers of health information technology, have represented that they were experts in achieving interoperability of data management systems.

195.    In marketing their IT solutions to the public both prior to and after July 2015, Defendants, or one or more of them, as solution providers of health information technology, have represented that they were experts who had achieved interoperability of data management systems.

196.    In July 2012, SAIC, in its strategy to spin-off a separate company while rebranding itself "Leidos," announced its acquisition of a healthcare company to bolster its growth plans in the healthcare market, touting its expertise in systems integration and interoperability.[11]

> The combination of maxIT Healthcare with VCS also strengthens SAIC's capabilities to provide EHR implementation and integration services to its strong base of Federal healthcare customers as they increasingly migrate toward the incorporation of commercial off the shelf (COTS) EHR applications. As both commercial and Federal healthcare providers begin to fully extract value from their EHR solutions, *SAIC is well positioned to leverage its service offerings in systems integration and interoperability*, health sciences and advanced data analytics to assist providers in realizing the promise of personalization in delivering value-based healthcare. [(Emphasis added.)]

197.    In November 2012, SAIC (Leidos) announced its expertise to enhance interoperability in problem areas other than healthcare.[12]

> "This sale of MEDAL helps make the JMSDF and the U.S. Navy more interoperable," said Thomas Watson, SAIC senior vice president and business unit general manager. "Japan is a crucial ally and its mine warfare forces are known and respected for their capabilities world-wide. We look forward to a long relationship with the JMSDF, and also to *exploring the potential to further*

---

[11]    Leidos. *SAIC To Acquire maxIT Healthcare* at https://investors.leidos.com/news-and-events/news-releases/press-release-details/2012/SAIC-To-Acquire-maxIT-Healthcare/default.aspx. July 17, 2012.
[12]    Leidos. *Japan Maritime Self-Defense Force Awards Contract to SAIC* at https://investors.leidos.com/news-and-events/news-releases/press-release-details/2012/Japan-Maritime-Self-Defense-Force-Awards-Contract-to-SAIC/default.aspx. November 6, 2012.

*enhance interoperability and provide solutions* to the JMSDF and other allied nations." [(Emphasis added.)]

198.    Again, in November 2012, SAIC (Leidos) announced contracts it had been awarded for

healthcare, encompassing EHRs.[13]

> New contracts and work orders range from *implementing electronic health record (EHR) products and systems* for commercial healthcare providers, to a number of new federal programs in health information technology, life sciences, and behavioral health services. [(Emphasis added.)]

> "This has been an important quarter for our health solutions team, as we work to unify our commercial healthcare teams and leverage their skills across both the commercial and federal markets," said SAIC Senior Vice President and Health Solutions Business Unit General Manager Steve Comber. "*We are pleased to continue supporting all of our customers in both markets, whether it's helping to implement EHRs at hospitals to maximize efficiencies*, or using health analytics and other solutions to enhance the health and deployment readiness of our military personnel around the world." [(Emphasis added.)]

199.    Further again in November 2012, SAIC (Leidos) announced its expertise in developing a

commercial solution to achieve interoperability in problem areas other than healthcare.[14]

> Science Applications International Corporation (SAIC) [NYSE: SAI] today announced the release of the GRGlobe™ application, a new commercial software solution to create, edit, and visualize Geographic Information Systems (GIS) data natively in a Google Earth™ environment. GRGlobe enables the visualization of spatial data by structuring it into organized layers and overlaying the feature data on a Google Earth globe. *GRGlobe provides structure to data to enable GIS functionality for use in government, defense,* emergency response, law enforcement, energy, environmental, utility, education, land management, forestry, and other applications. [(Emphasis added.)]

> Key benefits of using GRGlobe include:

> • Provides key functionality for *adding and importing data* from popular GIS and document formats, *facilitating data interoperability*.

---

[13]      Leidos. *SAIC Announces Recent Contract Awards in Healthcare* at https://investors.leidos.com/news-and-events/news-releases/press-release-details/2012/SAIC-Announces-Recent-Contract-Awards-in-Healthcare/default.aspx. November 8, 2012.
[14]      Leidos. *SAIC Launches GRGlobe^{TM}* at https://investors.leidos.com/news-and-events/news-releases/press-release-details/2012/SAIC-Launches-GRGlobe/default.aspx. November 8, 2012.

- Allows users to easily query and search data.
- Enables *data to be categorized logically* in a table of contents *using attributes and symbology*, allowing users to efficiently query and visualize data. [(Emphasis added.)]

200.    In February 2013, Becker's Healthcare reported Defendant Cerner and McKesson may join forces for health information exchange ("HIE") and interoperability.[15]

Cerner and McKesson, both electronic health record product vendors, are working on a joint agreement to enable cross-vendor, national health information exchange, sources say, according to a SearchHealthIT report.

The deal, if completed, could *shift the entire interoperable landscape for hospitals, physicians and patients*. [(Emphasis added.)]

201.    Later in February 2013 at the Healthcare Information Management and Systems Society ("HIMSS") annual conference and exhibition, Defendant Cerner announced:[16]

Cerner will demonstrate the capabilities of *CareAware iBus*™ and our Clinical Exchange Program within the *HIE Interoperability Showcase*. During Exhibit hours, visit the Cerner kiosk to see how *we are meeting HIE industry interoperability standards* by communicating with third-party vendor systems and attend our Cerner-sponsored presentation in the Showcase Theater on March 6. [(Emphasis added.)]

*CareAware*™ *Ecosystem*: Data should be shared across systems and between devices —regardless of EHR platform. *CareAware* creates a connected environment through universal interoperability and patient engagement.

202.    In May 2013, CommonWell Health Alliance, for which Cerner was one of the founding members, was announced[17] to the public:

---

[15]      Becker's Health IT & CIO Report. *Cerner, McKesson May Join Forces for HIE, Interoperability* at https://www.beckershospitalreview.com/healthcare-information-technology/cerner-mckesson-may-join-forces-for-hie-interoperability.html. February 5, 2013.

[16]      Cerner. *Experience Health Care Innovation With Cerner at HIMSS13* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/experience-health-care-innovation-cerner-himss13. February 27, 2013.

[17]      CommonWell Health Alliance. *Cerner, McKesson, Allscripts, athenahealth, Greenway and RelayHealth Announce Ground Breaking Alliance to Enable Integrated Health Care* at https://www.commonwellalliance.org/news-center/commonwell-news/cerner-mckesson-

> Top health care information technology (HIT) companies Cerner, McKesson, Allscripts, athenahealth, Greenway Medical Technologies® and RelayHealth announced today the launch of the CommonWell Health Alliance™, planned to be an independent not-for-profit organization that will support ***universal, trusted access to health care data through seamless interoperability***… The formation of this alliance takes health care a step closer to broad industry interoperability. [(Emphasis added.)]

203.    In September 2013, Leidos presented an Investor Day Briefing in which it represented its then-current expertise in interoperability, especially in the healthcare space.[18]

> What Makes Us Distinctive: Rich Markets
> Health ($43B)
> - ***Improve access and quality of healthcare by driving*** digitization, ***interoperability*** and personalized medicine. [(Emphasis added.)]
>
> Systems Integration – Integration and ***Interoperability***
>
> **VA/DoD EHR Integration Opportunity**
> ➢ Servicing over 18 million patients in both VA / MHS
> ➢ ***Total program cost: ~ $5 - $20 billion***
> ➢ High Congressional visibility creating pressure for action
> ➢ Possible Scenarios:
>    – Expansion of existing sharing platforms
>    – Adoption of existing systems by differing agency
>    – Integration and deployment of new EHR systems (COTS) [(Emphasis added.)]

204.    In October 2013, Cerner announced a vendor-neutral platform enabling interoperability[19]

> "*CareAware Connect* represents a significant addition of communication capabilities to the *CareAware **vendor-neutral platform enabling interoperability and seamless communication*** between medical devices, health care applications ***and electronic health record systems***," said Don Bisbee, senior vice president with Cerner. "With the addition of voice and secure messaging, new workflow efficiencies in the health care environment are now possible by enabling a more connected care team and **effective cross-continuum communications**." [(Emphasis added.)]

---

allscripts-athenahealth-greenway-relayhealth-announce-ground-breaking-alliance-enable-integrated-health-care/. May 4, 2013.

[18]    Leidos. *Leidos Investor Day* at http://media.corporate-ir.net/media_files/IROL/19/193857/Leidos_Investor_Day_Briefing_091113.pdf. Sep 11, 2013.

[19]    Cerner. *CareAware Connect Enables Fast, Easy and Smart Communications for Clinicians on the iPhone* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/careaware-connect-enables-fast-easy-and-smart-communications. October 4, 2013.

205.    In February 2014, MarketWatch published a press release and cited statements from Cerner

on data interoperability:[20]

> NextGen Healthcare Information Systems, LLC., a wholly owned subsidiary of
> Quality Systems, Inc. QSII and a leading provider of healthcare information
> systems and connectivity solutions, announced today the *company and Cerner*
> *have achieved a bilateral certification* of the NextGen® Ambulatory Solution
> Suite and the Cerner Network as *having bi-directional data interoperability*.
> "Cerner believes that a connected healthcare system leads to a better healthcare
> system. Our work with NextGen is important as it helps *break down some of the*
> *barriers that exist in achieving interoperability today*. We look forward to our
> continued working relationship with NextGen and servicing our mutual clients,"
> said Bob Robke, vice president of Cerner Network. [(Emphasis added.)]

206.    In March 2014, Defendant Leidos announced contracts it had been awarded by the VA

involving interoperability.[21]

> Leidos was also awarded a subcontract by By Light Professional IT Services to
> provide technical development support to the VA's Repositories Program, *which*
> *supports integrated, computable, and viewable access to VA patients' electronic*
> *health records. The program accesses, stores, and integrates administrative and*
> *clinical data from all VistA sites across the VA healthcare systems*. It also
> accesses and provides administrative and clinical patient-centric data to systems
> external to the VA such as the Department of Defense (DoD). [(Emphasis added.)]

> The VA's Repositories Program is pivotal in meeting President Obama's
> Healthcare Initiative for sharing patient data between the VA, DoD, and other
> external agencies. The program's data services and databases of administrative
> and clinical patient health record information provide opportunities to the VA and
> serve as a source for *the exchange of interoperable health record data between*
> *the DoD and the VA*. [(Emphasis added.)]

207.    In May 2014, Leidos announced further contracts with the VA and detailed its expertise in

the healthcare space that speaks to the data involving interoperability.[22]

---

[20]    MarketWatch. *NextGen   Healthcare   and   Cerner   Announce   Bi-Lateral   Data*
*Interoperability* at https://www.marketwatch.com/press-release/nextgen-healthcare-and-cerner-
announce-bi-lateral-data-interoperability-2014-02-25. Feb 25, 2014.

[21]    Leidos. *Leidos Awarded Contracts by Department of Veterans Affairs* at
https://investors.leidos.com/news-and-events/news-releases/press-release-details/2014/Leidos-
Awarded-Contracts-by-Department-of-Veterans-Affairs/default.aspx. Mar 11, 2014.

[22]    Leidos. *Leidos   Awarded   Contract   by   Department   of   Veterans   Affairs*   at

As a leader for more than 25 years in the healthcare industry, Leidos Health fuses some of the world's most advanced technologies with the brightest minds in science, research, and consulting. Today, Leidos Health is focused on developing next-generation solutions in areas such as biomedical research, public health, and health analytics to *turn data into actionable information for clinicians and their patients*. From leading groundbreaking medical research to fight diseases such as cancer, AIDS, and malaria, to *implementing and optimizing electronic health records that enhance the research process and improve critical efficiencies* – Leidos Health's passion to improve patient care and reduce costs is helping to transform healthcare. For more information, visit www.Leidos.com/health. [(Emphasis added.)]

208. In July 2014, Leidos announced its expertise in undertaking architecture design and messaging, both of which are required to achieve interoperability.[23]

The NHSN is the nation's most widely used healthcare-associated infection (HAI) tracking system, providing facilities, states, regions and the nation with data needed to identify problem areas, measure progress of prevention efforts and ultimately eliminate HAIs. Under the task order, Leidos will provide development, support and maintenance of NHSN, including: testing, maintenance and development of the application; level one user support; *technical architecture and design; electronic messaging processing and support*; and development, deployments, system documentation and all other deliverables consistent with the CDC Enterprise Project Life Cycle guidelines. [(Emphasis added.)]

209. In September 2014, Cerner announced in their news release the partnership with Leidos:[24]

Cerner is a member of the **Leidos Partnership for Defense Health**, an alliance that includes Leidos, the domain experts in Military Health, and Accenture, a global IT and management consulting company and one of the largest EHR systems integrators in the world. If awarded, the Leidos Partnership *will transition the DoD smoothly and securely to an open, modern, secure and interoperable system, informed by the most comprehensive medical information across the continuum of care*. [(Emphasis added.)]

https://investors.leidos.com/news-and-events/news-releases/press-release-details/2014/Leidos-Awarded-Contract-by-Department-of-Veterans-Affairs/default.aspx. May 5, 2014.

[23]    Leidos. *Leidos Awarded $44 Million Contract by the Centers for Disease Control and Prevention*    at    https://investors.leidos.com/news-and-events/news-releases/press-release-details/2014/Leidos-Awarded-44-Million-Contract-by-the-Centers-for-Disease-Control-and-Prevention/default.aspx. Jul 30, 2014.

[24]    Cerner. *Intermountain Healthcare Partners With Cerner to Provide Clinical Governance for Leidos Partnership for Defense Health* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/intermountain-healthcare-partners-cerner-provide-clinical. Sep 24, 2014.

*Leidos, Accenture and Cerner are trusted partners for Defense Health*, offering unrivaled deployment experience and an *Electronic Health Record (EHR) solution built on modern, modular and open architecture* that the military community, their families and the providers who serve them can count on today and well into the future. The Partnership draws on the collective strengths and *proven innovation of three global leaders in* health IT, *interoperability and military EMR and EHR with decades of experience on critical programs of this scale*. For more information on the Leidos Partnership for Defense Health, please visit leidosdefensehealth.com. [(Emphasis added.)]

210.    Further in September 2014, Leidos announced a contract with the VA to support its Enterprise Architecture ("EA") Program.[25] This task order is critical in complying with OMB M-04-16 to ensure the current state of the architecture is properly documented so as to form the basis for all discussions for DoD/VA EHR interoperability.

OneVA EA program provides *critical information for decision makers transforming the VA into an integrated enterprise.* Under the contract, Leidos will perform complex analyses of VA business processes, organizational structures and information technology (IT) to help the VA develop and implement the OneVA EA program. Leidos will provide data collection and analysis services; review and support portfolio management efforts; assist in the formulation and capture of business IT plans and policies; and participate in the execution of enterprise architecture in support of VA enterprise transformation efforts. [(Emphasis added.)]

*"We're proud to support the VA with its OneVA Enterprise Architecture program*, designed to serve as a strategic planning and management tool that helps VA's leadership chart the course for the Department's transformation into a 21st century organization," said Steve Comber, Group President of Leidos Health. [(Emphasis added.)]

211.    In October 2014, FCW reported that Leidos, Cerner, and Accenture touted interoperability in pursuing the now MHS GENESIS DoD EHR Contract.[26]

Experience on sprawling and diverse networks that range from hospital centers in the continental United States to far-flung outposts, submarines, ships and aircraft is

---

[25]    Leidos. *Leidos Awarded $25 Million Task Order by Department of Veteran Affairs* at https://investors.leidos.com/news-and-events/news-releases/press-release-details/2014/Leidos-Awarded-25-Million-Task-Order-by-Department-of-Veterans-Affairs/default.aspx. Sep 30, 2014.
[26]    Mazmanian, A. FCW. *Leidos team touts interoperability in military EHR bid* at https://fcw.com/articles/2014/10/03/defense-electronic-health-records.aspx. Oct 3, 2014.

a sweet spot for Leidos, said Jerry Hogge, deputy group president at Leidos Health Solutions Group.

**"We're very well acquainted with the infrastructure that exists,"** Hogge told FCW on a conference call that included executives from Cerner and Accenture. "It does require that the system be deployed in a low- or no-connectivity environment -- the theater of war -- and our systems are capable of operating in those environments." [(Emphasis added.)]

**The Leidos team is stressing the interoperability of Cerner's EHR system.** [(Emphasis added.)]

Travis Dalton, general manager of Cerner Federal, said **his company began working on interoperability about 15 years ago** because it thought the market was headed in that direction and that **functional interoperability would differentiate Cerner from its largest competitor, Epic.** [(Emphasis added.)]

**"Interoperability is actually key and central to having the data," Dalton said. "If you don't have the data and if you're not open to the data, you can't use the data** for predictive modeling and analytics. We think that's crucially important -- not just to interoperate but to actually use that data in a meaningful way to do predictive modeling and really engage the population. **That's an opportunity well beyond the mechanics of interoperability.** That goes to the managing of a population, which is ultimately what we want to do." [(Emphasis added.)]

**"The leadership at DoD has said repeatedly that this is an opportunity for the Defense Department to lead in interoperability,"** said Jim Traficant, managing director of Accenture Federal Services.**"** The opportunity to innovate comes from this **modular, open, standards-based approach** so that you're not locked into a particular model over the next 20 years. You can take advantage of innovation wherever it occurs." [(Emphasis added.)]

212.     Further in October 2014, Leidos published the biomedical cancer research annual report in

which interoperability is addressed.[27]

The goal of the Clinical and Translational Imaging Informatics Program (CTIIP) is to establish an informatics infrastructure that demonstrates the **benefit and feasibility of data interoperability** across the three domains: genomics, diagnostic imaging, and digital pathology. [(Emphasis added.)]

213.     In November 2014, EHR Intelligence reported a statement from Cerner that it would

---

[27]     Leidos. *Leidos Biomedical Research, Inc. 2014-2105 Annual Report* at https://www.cancer.gov/about-nci/contracts/fnlcr-acquisitions/resources/files/FNLCR_Annual_Report_2014-2015.pdf.

provide free CommonWell interoperability services:[28]

> Connecting to the EHR interoperability platform developed by a consortium of EHR developers will **not come at an added cost for customers of one contributing EHR company** — at least for three years. [(Emphasis added.)]

> Following his keynote during the Cerner Health Conference, the company's CEO Neal Patterson revealed that Cerner clients will have free access to CommonWell services through the end of 2017, but the latter are still responsible for paying for a fee for the initial setup.

214.    In February 2015, Cerner announced its industry ranking and highlighted interoperability:[29]

> "**Long before interoperability became an industry hot topic, Cerner understood the importance of helping providers connect information across organizational, geographic and technological boundaries**," said Bob Robke, Cerner vice president for interoperability strategies and solutions, and board treasurer for CommonWell Health Alliance. "Our continued high marks from clients in the Black Book HIE user survey demonstrate that **Cerner has been able to successfully break through organizational silos to connect information** that can benefit providers and patients." [(Emphasis added.)]

215.    In March 2015, Cerner announced a healthcare provider joining their alliance to advance interoperability:[30]

> "Magruder Hospital is helping **lead the charge for interoperability across health care**," said Bob Robke, CommonWell treasurer and Cerner vice president of Network Services. "Our organizations share a common belief that every person's medical record should follow them, **regardless of where they receive medical treatment or the type of EHR system that houses their records**." [(Emphasis added.)]

---

[28]    EHR Intelligence. *Cerner Provides Free CommonWell Interoperability Services* at https://ehrintelligence.com/news/cerner-provides-free-commonwell-interoperability-services. November 5, 2014.

[29]    Cerner. *Black Book Ranks Cerner No. 1 HIE-Centric EHR Provider for Inpatient, Ambulatory* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/black-book-ranks-cerner-no-1-hie-centric-ehr-provider-inpatient. February 17, 2015.

[30]    Cerner. *Magruder Hospital Will Begin Using CommonWell Health Alliance Services to Advance Interoperability* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/magruder-hospital-signs-commonwell-services. March 30, 2015.

216.    In April 2015, Cerner made two announcements regarding its commitment to interoperability[31], the second noted

> "***Cerner has long been committed to connecting organizations and systems***, regardless of platform or provider, to ensure the free flow of data across the continuum of care," said Zane Burke, president, Cerner. "Across multiple HIMSS engagements, we look forward to sharing our story of connected health care and the importance of ***true, industry-wide interoperability***." [(Emphasis added.)]

217.    Shortly thereafter in April 2015, Cerner announced another healthcare provider joining their alliance to advance interoperability[32]

> "Circle Health is helping ***lead the charge for interoperability across health care***," said Bob Robke, CommonWell treasurer and Cerner vice president of Network Services. "Our organizations share a common belief that every person's medical record should follow them, ***regardless of where they receive medical treatment or the type of EHR system that houses their records***." [(Emphasis added.)]

218.    A day later in April 2015, Cerner announced a healthcare provider joining their alliance to advance interoperability:[33]

> "Northern Arizona Healthcare is helping ***lead the charge for interoperability across health care***," said Bob Robke, CommonWell treasurer and Cerner vice president of Network Services. "Our organizations share a common belief that every person's medical record should follow them, ***regardless of where they receive medical treatment or the type of EHR system that houses their records***." [(Emphasis added.)]

219.    The next day in April 2015, Cerner furthered that advancement with the following

---

[31]    Cerner. *Cerner to Highlight Commitment to Interoperability at HIMSS15* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-highlight-commitment-interoperability-himss15. April 8, 2015.

[32]    Cerner. *Lowell General Hospital Will Begin Using CommonWell Health Alliance(R) Services to Advance Interoperability* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/circle-health-signs-commonwell-services. April 8, 2015.

[33]    Cerner. *Northern Arizona Healthcare will begin using CommonWell Health Alliance™ services to advance interoperability* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/northern-arizona-healthcare-signs-commonwell-services. April 9, 2015.

announcement affecting interoperability:[34]

> "Nanticoke is helping *lead the charge for interoperability* across health care," said Bob Robke, CommonWell treasurer and Cerner vice president of Network Services. "Our organizations share a common belief that every person's medical record should follow them, *regardless of where they receive medical treatment or the type of EHR system that houses their records.*" [(Emphasis added.)]

220.    Again, in April 2015, Cerner announced advancing interoperability among disparate EHR

platforms through a partnership:[35]

> Cerner Corp., Geisinger Health System and xG Health Solutions have collaborated to enable the use of emerging *SMART®* on *FHIR®* industry standards to facilitate use of software applications across compliant *"open platform" electronic health record (EHR) systems, such as Cerner Millennium®.* [(Emphasis added.)]

> "SMART on FHIR creates an *important new kind of interoperability*," said Dr. David McCallie, Jr., senior vice president, medical informatics at Cerner. "*Application interoperability* will enable innovative developers to reach a broader market of potential users, while at the same time enabling open platform EHR suppliers to provide a more robust set of offerings to their clients." [(Emphasis added.)]

221.    Also in April 2015, Becker's Healthcare reported on the Cerner, Leidos, Accenture, and

Henry Schein partnership for the now MHS GENESIS DoD EHR Contract.[36]

> Although there are just months until the final decision comes down in the summer, Jerry Hogge, senior vice president and deputy group president for Reston, Va.-based Leidos Health, said the *team has been working on the bidding process for the better part of two years*. Leidos holds a number of federal contracts, bringing the federal experience to the team, and flows with Dublin, Ireland-based

---

[34]     Cerner. *Nanticoke Health Services Will Begin Using CommonWell Health Alliance(TM) Services to Advance Interoperability* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/nanticoke-health-services-signs-commonwell-services. Apr 10, 2015.

[35]     Cerner. *Cerner, xG Health and Geisinger to Advance Interoperability Among Disparate EHR Platforms* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-collaborates-geisinger-xg-health-solutions-enable-smart. Apr 14, 2015.

[36]     Becker's Healthcare. *Inside the Cerner, Leidos, Accenture, and Henry Schein DOD contract bid* at https://www.beckershospitalreview.com/healthcare-information-technology/inside-the-cerner-leidos-accenture-and-henry-schein-dod-contract-bid.html. Apr 15, 2015.

Accenture's implementation practice, Kansas City, Mo.-based Cerner's EHR platform and Melville, N.Y.-based Henry Schein's distribution reach and dental expertise, he said. [(Emphasis added.)]

Mr. Hogge joined Travis Dalton, Cerner's vice president and federal general manager, Jim Traficant, president of Accenture Federal Services subsidiary ASM Research, and Kevin Bunker, president of Henry Schein's North America Dental Practice Solutions, in a conversation with *Becker's Hospital Review* about the contract bid.

JH: As the picture became clearer for what this acquisition was going to be, it became clear that Leidos' experience would complement what Accenture has to bring, which is the largest EHR deployment company globally. Given the DOD's *focus on interoperability*, modularity and modern open systems architecture, it was a natural fit to team with Cerner and Henry Schein. [(Emphasis added.)]

Jim Traficant: How Accenture thought about this in partnering with Leidos is the focus on the mission. This is about national security and a very unique health system, in that the DOD is global. *The solution is designed for interoperability, which supports the DOD's mission. The DOD has to interoperate with the private sector.* The other point I would make here that's very unique about the team is that Leidos as a company is unmatched with their global support for the defense community today. This is not something you can just walk in and pick up. This is very unique. [(Emphasis added.)]

222. After July 29, 2015 when the DoD EHR Contract was awarded to Defendant Leidos, Cerner continued to make representations about its current expertise in achieving interoperability for EHRs.

223. In August 2015, Cerner made a broad assertion in announcing a new customer[37]

*Cerner's interoperability capabilities* also enable the system to *share health records with outside health organizations regionally and nationally.* [(Emphasis added.)]

---

[37]     Cerner. *Baptist Health South Florida Selects Cerner for Enterprise-Wide Health IT System* at     https://cernercorporation.gcs-web.com/news-releases/news-release-details/baptist-health-south-florida-selects-cerner-enterprise-wide. Aug 4, 2015.

224.    In August 2015, Cerner announced interoperability with authorizations:[38]

"Integrating CoverMyMeds within Cerner's EHR provides physicians access to a modern and efficient authorization process with fewer phone calls between doctors and pharmacies. We believe *increasing interoperability among pharmacies, prescribers and facility systems* will help improve the delivery of health care," said Kashif Rathore, senior director of interoperability, Cerner. [(Emphasis added.)]

225.    In August 2015, Cerner announced how its clients were joining together to achieve interoperability:[39]

Cerner, a founding member of CommonWell, is a *long-time contributor to the advancement of interoperability*. For years, Cerner has supported *open architecture concepts* that enable data to flow easily between disparate systems. Beyond CommonWell, Cerner offers solutions that help organizations advance business outreach goals within the community and beyond, including local, regional and national information exchange. [(Emphasis added.)]

"Patients should have the ability to grant clinicians access to their medical records," said Bob Robke, CommonWell chairman and Cerner vice president of interoperability. "*Each new provider that signs up for CommonWell services is a step toward our goal of true nationwide interoperability*." [(Emphasis added.)]

226.    In October 2015, Cerner announced the upcoming interoperability focus at the Cerner Health Conference[40]

Interoperability will be a focus for this year's CHC, with more than 20 industry leaders scheduled to discuss client outcomes, collaboration across the industry and device and *electronic health record connectivity*. On Oct. 12, Deven McGraw, deputy director for health information privacy at the U.S. Department of Health and Human Services' Office for Civil Rights, will address *overcoming compliance concerns to accomplish interoperability*. [emphasis added]

---

[38]    Cerner. *Cerner, CoverMyMeds Integrate to Streamline Electronic Prior Authorization (ePA)* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-covermymeds-integrate-streamline-electronic-prior. August 20, 2015.

[39]    Cerner. *Cerner Clients Join Together for Interoperability Services to Enable Access to Medical Records Across the U.S* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/pacific-northwest-health-care-organizations-join-commonwell. August 24, 2015.

[40]    Cerner. *Nearly 14,000 to Attend Annual Cerner Health Conference, Oct. 11-14* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/nearly-14000-attend-annual-cerner-health-conference-oct-11-14. October 1, 2015.

227.    Shortly later in October 2015, Cerner highlighted advancements in interoperability:[41]

Cerner, a global leader in health care technology, will *highlight recent advancements in interoperability* and share advice from industry experts on how health care providers have overcome legal and compliance challenges to more securely share data outside their organizations at the Cerner Health Conference (CHC), Oct. 11-14, in Kansas City, Mo. [(Emphasis added.)]

*"Cerner has long been committed to advancing industry-wide interoperability,"* said Bob Robke, Cerner's VP of Interoperability. "We will continue to put emphasis on this important topic with our clients, partners and government experts at CHC to help ensure progress toward achieving true, patient-centered interoperability." [(Emphasis added.)]

228.    Again, in October 2015, Cerner announced production release of interoperability technology:[42]

Cerner, a global leader in health care technology, has unveiled a *production version* of HL7's *FHIR®* standard that is being tested in the Cerner *Millennium®* electronic health record (EHR).

"This next-generation standards framework enables health care organizations to utilize *Cerner's open platform,* which is designed to enable third-party innovators to advance care delivery and *improve interoperability capabilities* with other *FHIR*-compliant EHR systems," said Dr. David McCallie, senior vice president, medical informatics at Cerner. "This integrated approach will provide clinicians access to 'pluggable apps' directly within their workflows that are designed to expand and transform the way care is delivered." [(Emphasis added.)]

229.    Further again in October 2015, Cerner announced the apparent success of the CommonWell Health Alliance[43]

The reach of the CommonWell Health Alliance continues to grow, as Cerner announced today that more than 1,200 care provider sites, which represent more

---

[41]     Cerner. *Cerner to Highlight Advancements in Interoperability, Showcase Secure Data Sharing* at CHC at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-highlight-advancements-interoperability-showcase-secure. October 7, 2015.

[42]     Cerner. *Cerner Unveils Production Release of HL7 FHIR* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-clients-test-smart-fhir-apps-within-ehr. October 8, 2015.

[43]     Cerner. *Cerner Signs Up More Than 1,200 Provider Sites to Use CommonWell Services* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-signs-more-1200-provider-sites-use-commonwell-services. October 8, 2015.

than 75 Cerner clients, have signed up to use CommonWell interoperability services to date.

*"**Ubiquitous, nationwide interoperability will take time, but we're seeing positive momentum**,"* said Bob Robke, vice president of Interoperability, Cerner. "We're proud to have our clients joining us in ***advancing interoperability*** and applaud their leadership in getting our industry one step closer to helping patients share their records with their providers, wherever they receive treatment." [emphasis added]

230.    In February 2016, Cerner announced an interoperability demonstration:[44]

To highlight ***Cerner's commitment to robust, nationwide, patient-centric interoperability***, the booth will feature ***demonstrations of Cerner connectivity solutions*** designed to enable collaboration among care providers through the exchange of such clinical data as orders, lab results, documents, images, immunizations and prescriptions. [(Emphasis added.)]

231.    Again, in February 2016, Cerner announced its vision for interoperability:[45]

"Physicians should be able to easily access a patient's medical history and other relevant data to provide the most appropriate care," said Bob Robke, vice president, Interoperability, Cerner. "Connecting health organizations, large and small, will only help us ***push for true patient-centered interoperability***, with individuals becoming more involved in their health journey." [(Emphasis added.)]

232.    In March 2016, Defendant Cerner represented interoperability[46] to the public as:

the ability for information used to advance patient care to move between health care entities, regardless of the technological platform in place or location where care is provided. Interoperability occurs when information flows freely across organizational, vendor and geographical barriers.

233.    In April 2016, Defendant Cerner made representations regarding its ranking in

---

[44]    Cerner. *Model Experience, Unique Partner Solutions on Display to Showcase DoD's EHR Modernization* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/dhmsm-progress-population-health-innovations-highlight-cerner. February 11, 2016.

[45]    Cerner. *Cerner HIE Connects More Than 2.2 Million Patient Health Records in South Carolina, Georgia* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/cerner-hie-connects-more-22-million-patient-health-records-south. February 22, 2016.

[46]    Cerner. *Interoperability – Connecting the information ecosystem* at https://www.himss.org/cerner-connecting-information-ecosystem. Download: HIMSS16_Interoperability_Showcase_Success_StoryFINAL.pdf. March 17, 2016.

interoperability:[47]

> "Health and care are best when the entire care team is informed, connected and accountable," said Bob Robke, Cerner vice president for Interoperability. "Our continued high marks from clients in the Black Book HIE user survey show that *Cerner has been able to break through organizational silos to connect information* that can benefit providers and patients." [(Emphasis added.)]

234.    Again, in April 2016, Defendant Cerner made representations regarding a customer's

statements on its interoperability:[48]

> "As one of the leading care providers in our area of the country, it is essential that Centra continues to influence the health of not only our patients, but also our community as a whole," said Tibbs. *"We believe* Cerner's population health management and *interoperability solutions are the most advanced solutions available* and capable of meeting these needs." [(Emphasis added.)]

235.    In May 2016, Defendant Cerner made representations regarding a customer's expectations

on its interoperability:[49]

> Located in a popular south Florida vacation and seasonal destination, BRRH often treats patients from across the country. For this reason, *Cerner's interoperability functionality will help the health system exchange patient information among providers across the U.S. using industry standard*s. [(Emphasis added.)]

236.    Again, in May 2016, Defendant Cerner made representations regarding a customer's

expectations on its interoperability:[50]

> *Cerner's advanced interoperability capabilities* will enable the health system to

---

[47]    Cerner. *Black Book Ranks Cerner No. 1 Open System HIE Provider* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/black-book-ranks-cerner-no-1-open-system-hie-provider. April 8, 2016.

[48]    Cerner. *Centra Selects Cerner's Enterprise-Wide IT System* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/centra-selects-cerners-enterprise-wide-it-system. April 20, 2016.

[49]    Cerner. *Boca Raton Regional Hospital Selects Cerner's Clinical and Financial IT System* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/boca-raton-regional-hospital-selects-cerners-clinical-and. May 9, 2016.

[50]    Cerner. *Lake Health Selects Cerner to Implement Integrated Electronic Health Record* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/lake-health-selects-cerner-implement-integrated-electronic. May 19, 2016

*share and receive patient health records* with affiliated providers, other area hospitals and even participating health care entities *nationally*. [(Emphasis added.)]

237.   In February 2017, Cerner announced conference demonstrations on interoperability:[51]

Cerner will have an expanded presence *demonstrating its interoperability solutions*, which includes *SMART®* on *FHIR®*, *CareAware iBus®* device connectivity and Clinical Exchange Platform network interoperability functionality. Cerner is also collaborating with Brightree® to demonstrate a patient's seamless care transition from acute to home care to primary care *using CommonWell Health Alliance® interoperability services*. [(Emphasis added.)]

### The Impact of Infinity on Defendants' Marketed Interoperability to the Government

238.   As publicly traded companies, Defendants Cerner and Leidos have offered themselves as investments.

239.   The Cerner 2014 Annual Report informs its stockholders of the risk of interoperability:[52]

*Interoperability Standards*. Our clients are concerned with and often require that our software solutions and health care devices be *interoperable with other third party HCIT suppliers*. Market forces or governmental/regulatory authorities could create software interoperability standards that would apply to our solutions, health care devices or solutions, and if our software solutions, health care devices or services *are not consistent with those standards, we could be forced to incur substantial additional development costs to conform.* The Office of the National Coordinator for Health Information Technology (ONC) has developed a comprehensive set of criteria for the functionality, interoperability and security of various software modules in the HCIT industry. ONC, however, continues to modify and refine those standards. *Achieving certification is becoming a competitive requirement, resulting in increased software development and administrative expense to conform to these requirements.* [(Emphasis added.)]

240.   The Cerner 2015 Annual Report states the same.

241.   The Cerner 2016 Annual Report adds an additional risk:[53]

In addition, delays in interpreting these standards *may result in postponement or cancellation of our clients' decisions to purchase our solutions* or health care

---

[51]   Cerner. *Consumerism of Health Care, Patient Experience Highlights Cerner Presence in Booth 2161 at HIMSS17* at https://cernercorporation.gcs-web.com/news-releases/news-release-details/consumerism-health-care-patient-experience-highlights-cerner. Feb 2, 2017.

[52]   Cerner. Cerner Corporation / 2014 Annual Report.

[53]   Cerner. Cerner Corporation / 2016 Annual Report.

devices. *If our software solutions*, devices or health care devices are *not compliant* with these evolving standards, our *market position and sales could be impaired*, and we may have to *invest significantly in changes to our software solutions*, devices or health care devices. [(Emphasis added.)]

242.    The Cerner 2017 Annual Report states the same risk.

243.    The Defendant Leidos 2014 and 2015 Annual Reports do not reference interoperability.

244.    The Leidos 2016 Annual Report does reference interoperability, but it does not specifically identify interoperability risks.

245.    The Leidos 2017 Annual Report does not reference interoperability.

246.    Despite the risks surrounding interoperability, Defendants, or one or more of them, have represented that they achieved EHR interoperability in the private sector prior to 2015.

247.    Despite the risks surrounding interoperability, Defendants, or one or more of them, have represented that they achieved EHR interoperability in the public sector prior to and/or after 2015.

### The Impact of Defendants' Marketed Interoperability on the DoD and VA

248.    On or about July 29, 2015, the "Leidos Partnership for Defense Health," which included Defendants, was awarded a 10-year, $4.3 billion contract to overhaul and manage the EHRs for the DoD under Contract Number N00039-15-D-0044.

249.    Defendant Leidos labelled the new EHR system for the DoD "MHS GENESIS."

250.    MHS GENESIS is based on Cerner's Millennium commercial EHR IT software.

251.    Under the DoD EHR Contract, Defendant Leidos was the prime contractor, and Cerner, Accenture and Schein were Leidos' subcontractors.

252.    In a post-award contract announcement, Defendant Leidos referenced Defendant Cerner

and stated:[54]

> ***Cerner's leadership role in advancing interoperability in the health IT industry goes back almost a decade.*** In 2005, Cerner reached out to competing health IT companies to co-fund RAND research on the need for a national patient identification system, something that would solve a major barrier to ***safe nationwide interoperability***. [(Emphasis added.)]

253.   In the same announcement, Defendant Leidos provided a definition for interoperability and

shared that definition with the public as:

> Interoperability, put simply, is the ability for different health information technology systems to securely and electronically exchange ***computable*** patient information. Because patients receive care in different places, their health data can reside in many different systems. Interoperability helps clinicians improve the quality of patient care by ensuring health information is available wherever and whenever it's needed, no matter where or by whom care was provided in the past. True interoperability is far more complex than just simple data-sharing... [(Emphasis added.)]

254.   Again, in the same announcement, Defendant Leidos made representations regarding its

current experience in having achieved interoperability, in the present tense, by further stating:

> The Leidos Partnership for Defense Health was created to bring together the global expertise and presence of Leidos, Accenture, Cerner and Henry Schein to further support and continue to serve the defense community. ***Our interoperable, easy-to-use solution*** will connect the continuum of care from the battlefield to acute care and outpatient environments, both domestically and abroad. ***Our experience in executing interoperable EHR solutions at the scale required for the MHS GENESIS program is extensive and proven.*** [(Emphasis added.)]

255.   Still further in the same announcement, Defendant Leidos discloses that it may have also

contributed to problems attributed to the VA EHR IT system, VistA, that resulted in the VA EHR

contract being issued to Cerner in 2017:

> Leidos has in-depth knowledge and experience with similar programs, including work on the Armed Forces Health Longitudinal Technology

---

[54]   Leidos. *Interoperability: Anytime, Anywhere, Any System* at http://leidosdefensehealth.com/program-milestones/interoperability/

Application/Composite Health Care System, *the Veterans Health Information Systems and Technology Architecture (VistA)*, [(Emphasis added.)]

256.   Defendants, or one or more of them, did not have DoD EHR data models that were bounded.

257.   Defendants, or one or more of them, did not have DoD EHR data models that were bounded prior to the DoD's July 29, 2015 award of the government contract to Defendant Leidos to overhaul, update and manage the DoD EHR IT system.

258.   Defendants, or one or more of them, did not have bounded DoD EHR data models contained in the DoD's Data and Information Viewpoint ("D&IV"), the DoD's DRM for incorporation into the RFP.

259.   Defendants, or one or more of them, did not have bounded DoD EHR data models certified by the DoD CIO prior to July 29, 2015 for incorporation into the RFP.

260.   For their DoD MHS GENESIS contract, Defendants, or one or more of them, defined their interoperability solution[55] and explicitly represented that their IT solution was, in fact, already interoperable, as follows:

> The Leidos Partnership for Defense Health was created to bring together the global expertise and presence of Leidos, Accenture, Cerner and Henry Schein to further support and continue to serve the defense community. Our *interoperable, easy-to-use solution* will connect the continuum of care from the battlefield to acute care and outpatient environments, both domestically and abroad. *Our experience in executing interoperable EHR solutions at the scale required for the MHS GENESIS program is extensive and proven*.

261.   In fact, Defendants' experience, jointly or independently, in executing interoperable EHR solutions at the scale required for the MHS GENESIS problem was based entirely on the existing legacy DoD EHR System that one of the Defendants had developed and was now being replaced.

---

[55]    *Id.* (emphasis added).

262.    In fact, Defendants' experience, jointly or independently, in executing interoperable EHR solutions at the scale required for the MHS GENESIS problem was not proven as the existing legacy DoD EHR System that one of the Defendants had developed was not interoperable.

263.    Relying on Defendants' (or one or more of them) definition of "interoperability" for the DoD EHR contract, the DoD referenced the term "computable"[56] in its government contract procurement process preceding the signing of a DoD EHR Contract with Defendant Leidos.

264.    The term "computable" has a definite and specific meaning in Computer Science, specifically as it pertains to infinity and *intractable* decision problems.

265.    Defendants, or one or more of them, technically advised on the nomenclature, technical requirements and/or representations to the DoD in order to prepare the documentation for the DoD's government contract procurement process, leveraging their EA knowledge, if any, under DoD and VA contracts prior to July 29, 2015.

266.    Defendants, including but not limited to Defendant Leidos, technically advised on the EA documentation affecting Leidos' solution under DoD contracts prior to July 29, 2015.

267.    The DoD relied on the representations of Defendants, or one or more of them, that their experience in executing interoperable EHR solutions was "extensive and proven" and that its DoD EHR IT was an "interoperable, easy-to-use solution" as the basis to award the DoD EHR Contract to Defendant Leidos as its prior legacy DoD EHR System that they had developed was not.

268.    Defendants, or one or more of them, induced the DoD to award Leidos a contract based on the representations that Defendants, or one or more of them, could achieve intra- and interoperability with EHRs.

---

[56]    Davis, J. *VA to require Cerner prioritize interoperability, secure data exchange in EHR project*. At https://www.healthcareitnews.com/news/va-require-cerner-prioritize-interoperability-secure-data-exchange-ehr-project.  December 18, 2017.

269. Defendants, or one or more of them, made representations to the DoD in an effort to induce the DoD to have confidence and trust in Defendant Leidos as its prime contractor and Defendants as Leidos' subcontractors to enter into the DoD EHR Contract.

270. Defendants' (or one or more of them) representations to the DoD in an effort to induce the DoD to have confidence and trust in Defendant Leidos as its prime contractor and Defendants as Leidos' subcontractors to enter into the DoD EHR Contract were false.

271. After the July 29, 2015 award of the DoD EHR Contract, Defendants, or one or more of them, have continued to make representations to the DoD in an effort to induce the DoD to have confidence and trust in Defendant Leidos as its prime contractor and Defendants as Leidos' subcontractors to continue providing products and services under the DoD EHR Contract.

272. After the July 29, 2015 award of the DoD EHR Contract, Defendants', or one or more of them, continued representations to the DoD in an effort to induce the DoD to have confidence and trust in Defendant Leidos as its prime contractor and Defendants as Leidos' subcontractors to continue providing products and services under the DoD EHR Contract were false.

273. The DoD prior to July 29, 2015, relied on the representations of Defendants, or one or more of them, because the DoD did not have government technologists with competencies to constrain the DoD EA and relied principally on Defendants, or one or more of them, as contractor technologists.

274. As such, Defendants, or one or more of them, had an ethical duty and a duty of trust, honesty and integrity in compliance with federal regulations, to inform the DoD of the infinite possibilities posed by the EHR decision problem.

275. Without constraining infinity, Defendants' (or one or more of them) purported "transition plan" under the DoD EHR Contract does not constrain costs; costs are infinite.

276.    Without constraining infinity, Defendants under the DoD EHR Contract must proceed through trial and error across infinite possibilities.

277.    Defendants' representatives, or one or more of them, also represented to DoD officials prior to July 29, 2015 that their and/or Cerner's commercial EHR IT system, after being customized for the DoD, would *with certainty* make EHRs intra-operable throughout the DoD healthcare system.

278.    Defendants' representatives, or one or more of them, also represented to DoD officials prior to July 29, 2015 that their and/or Cerner's commercial EHR IT system, after being customized for the DoD, would *with certainty* make EHRs interoperable between the VA, DoD and third-party private medical service providers.

279.    Defendants' aforementioned representations (referenced in the preceding paragraphs) to DoD officials were made to induce the DoD to award Defendant Leidos the DoD EHR Contract.

280.    Defendants, among other government contracting firms, provided the technical expertise for the DoD Request for Proposals Performance Work Statement ("PWS") for Solicitation Number N00039-14-R-0018 because of the outsourcing initiated prior to 2015.[57]

281.    Defendants, and principally Defendants Cerner and Leidos, misrepresented their so-called "proven expertise" to create a transition plan for the DoD's EHR IT System to make DoD EHRs intra-operable and interoperable.

282.    To be interoperable, the technologist's solution to the decision problem in Computer Science involves more than a common language.

283.    Thus, assuming the English language is a common language, then a person from New England, say the Boston area, could easily "interoperate", or communicate, with a person from the

---

[57]    DHMSM IDIQ PWS, issued on or about August 25, 2014.

South. Likewise, a rapper could interoperate with an opera singer, again in English. The classic example is the book "Pygmalion," also known as "My Fair Lady."

284.    Interoperability requires more than just a common language.

285.    To be interoperable, the technologist's solution to the decision problem in Computer Science must also include semantics, the context in which the language is used, and the dialects within the language used.

286.    Defendants Leidos and Cerner have represented to the DoD, the VA, Congress and the public that use of a common language alone is the standard and will achieve interoperability.

287.    Defendants, or one or more of them, made statements that their EHR IT solution would result in intra-operability of EHRs throughout the DoD EHR IT system and interoperability between the VA, DoD and third-party medical service providers.

288.    The statements by Defendants, or one or more of them, to the DoD that the EHR IT solution shall achieve intra- and interoperability of EHRs in one unified IT system were false.

289.    By locking in a vender relationship with Defendant Leidos and its subcontractor Defendants for the long term, the DoD will be required to use Cerner's proprietary software.

**The DoD EHR Contract Is Modified To Include The U.S. Coast Guard**

290.    In fact, on or about June, 2018, the DoD's Defense Health Agency, Contracting Office – Defense Healthcare Management Systems ("CO-DHMS"), as reflected in J&A Number JA18-0052, sought justification and approval for a sole source award to Leidos to modify Contract No. N00039-15-D-0044 involving the DoD EHR Contract to incorporate the U.S. Coast Guard into the DoD EHR IT implementation (hereinafter "Justification Memo").

291.    In the Justification Memo, DoD has stated: "The Government's reasonable standardization requirements cannot be realized unless they are implemented as part of the MHS GENESIS

solution as part of standard commercial 'as a service' offerings provided by Cerner as part of the

Leidos Partnership for Defense Health." (Page 9)

292.    In the Justification Memo, DoD has stated: "Cerner has asserted that it does not provide

these solutions through other resellers in a way that would enable the Government to continue to

utilize the Cerner solution but in a competitive environment for these extended capabilities.

Therefore, no vendor other than Cerner, as a member of the Leidos team, can satisfy the

requirement for a standard enterprise baseline." (Page 9)

293.    In the Justification Memo, DoD has stated:

> Further, while Cerner is a critical component of the MHS GENESIS solution, it is
> not the only component. Leidos, the service provider integrator and prime
> contractor, is essential to the provision, support, and implementation of the entire
> solution, including Cerner and non-Cerner components. For the same reasons the
> Government determined that a single-award contract for the solution was
> appropriate, it continues to believe that one single contract for the DoD/USCG
> partnership is in its best interest because the projected work are so integrally related
> that only a single prime contractor can reasonably perform it. (Page 9)

294.    In the Justification Memo, DoD has stated:

> In order to fully enable the capabilities and environments necessary to achieve a
> standard baseline, given the Government's investment in the Cerner-based solution,
> MHS GENESIS requires direct access to *proprietary Cerner intellectual property*
> (IP), such as Clinical Application Services, which is only available from Cerner.
> As this IP is proprietary and the result of private expenditures and research and
> development, *the Government does not have rights to access or use this IP*, or to
> provide it to other entities for use. Allowing a third-party to have access to the
> Cerner IP could adversely impact Cerner's financial viability and competitive
> market advantage.
>
> *The Contracting Officer inquired with the Leidos Partnership as to whether
> Cerner would be willing to negotiate the rights to the IP necessary to enable
> competition. On May 24, 2018, Cerner declined, in writing, to enter into such
> negotiations for its own business reasons.* (Page 11, emphasis added)

295.    By requiring the DoD to use Cerner's proprietary software, to the exclusion of other

vendors, Defendants have prevented the DoD, VA and recently the U.S. Coast Guard from seeking

and utilizing innovations by other new vendors and competitors.

296.    However, in September **2010**, the National Institute of Standards ("NIST") publication[58]

rejected this type of recommendation,

> A common path taken to achieve interoperability (by this definition) is to build systems consisting of ***components made from a single vendor***. Such systems are generally interoperable, but n***ot typically interchangeable with components from other vendors***. ***Single vendor mandated interoperability limits freedom of component choice***, incurs risk of vendor viability and corporate mergers, and commonly pushes information translation costs down to suppliers and vendors, who pass the cost right back to the end user in the form of higher component prices. Little is saved and much is risked. It is an ***illusory interoperability***.
>
> Furthermore, ***single vendor mandates generally do not deliver the interoperability as planned due a variety of factors***, including vendor volatility, corporate mergers, and acquisitions. Enter language translation. With translation, systems consisting of components made from multiple vendors now become "interoperable," as well as interchangeable, albeit at a cost, since translation incurs labor costs, information quality losses, license fees, and training costs. To make matter worse, the number of translators required for interoperability increases multiplicatively with respect to the number of component vendors at each interface in the system. ***This too is illusory interoperability***." [(Emphasis added.)]

297.    Given that there were no DoD technologists from 2013 through July 2015 competent in

recognizing the decision problem affecting interoperability to specify and validate the

requirements for an IT acquisition, the DoD (and now the VA and U.S. Coast Guard) relied ***entirely***

on Defendants, or one or more of them, as contractor technologists.

298.    Any DoD-employed technologists, if any existed at the DoD prior to July 2015, were not

competent to constrain infinity in solving the EHR interoperability decision problem.

299.    Instead, contractor technologists, including Defendants, were tasked to constrain infinity

in solving the EHR interoperability decision problem.

---

[58]    Horst, J., Hartman, N. and Wong, G. *Metrics for the Cost of Proprietary Information Exchange Languages in Intelligent Systems*. PerMIS '10 Proceedings of the 10th Performance Metrics for Intelligent Systems Workshop. Sep 2010. pp. 82-86.

**The DoD Concluded That Defendants' DoD EHR IT System Is *Not* Interoperable**

300.    On or about April 30, 2018, the DoD Joint Test Interoperability Command ("JTIC")

published a report[59] on the status of its DoD EHR IT system contract with Defendant Leidos and

other Defendants for MHS GENESIS.

301.    The JTIC report stated, "COI 2 [("Critical Operational Issue")]: Interoperability – Do MHS

GENESIS interfaces support or enable accomplishment of mission activities and tasks?"

302.    Referring back to the introductory discussion on mathematics and the decision problem

above, a man-made system is "MHS GENESIS interfaces"; a ***string*** of elements (as defined in

paragraph 13 above) is "mission activities and tasks"; and ***accept*** (also defined in paragraph 13

above) is "support or enable accomplishment."

303.    COI 2 is the Computer Science decision problem expressed in DoD's parlance.

304.    The JTIC Report findings for COI 2 were as follows:

> JITC ***did not have sufficient end-to-end data on information accuracy and
> completeness to fully evaluate interoperability*** with external systems. Additional
> interoperability testing is required to ensure MHS GENESIS can properly interface
> with legacy DOD systems to support medical missions.... (at page 5)

> Interoperability is critical for MHS GENESIS to accurately transfer data to and
> from legacy DOD systems, such as the Defense Eligibility Enrollment System
> (DEERS) that ascertains eligibility for DOD medical benefits. Testers based the
> interoperability assessment on an analysis of conformance to the ICDs [("Interface
> Control Document")] and the identified standards, IRs [("Incident Reports")] related
> to interoperability, and observations of user actions and user interviews. ***They did
> not receive end-to-end data from either MHS GENESIS or external interfacing
> systems, and therefore could not fully evaluate the accuracy and completeness of
> data exchanges***.... (at page 9)

> ***Data sent from MHS GENESIS either did not conform to its ICDs, did not
> conform to the applicable standards, or did not conform to both for any of the
> evaluated outbound interfaces.*** Failure to conform to standards and controls can

---

[59] DoD Joint Interoperability Test Center (JITC), Office of Secretary and Defense (OSD)
Memorandum, *Military Healthcare System (MHS) GENESIS Initial Operational Test and
Evaluation (IOT&E) Report.* April 30, 2018.

result in failure to communicate due to *improper parsing, truncation, incorrect encoding, or loss of data. This causes users to question the accuracy of the information they receive and can lead to a time-consuming check of information from other sources.*

Users generated *22 high-severity IRs [(again, Incident Reports)] that the testers attributed to interoperability. These IRs describe multiple problems with accuracy and completeness that prevented or degraded mission completion. The problems included confliction with identified standards, undefined values and characters, undefined data types, undefined extra fields, unpopulated data fields, and other discrepancies.* The IRs affected Personnel Eligibility and Enrollment, Military Medical Readiness, Radiology, and information exchange with Defense Medical Information Exchange (DMIX) and the Joint Legacy Viewer (JLV). (at page 9)

Personnel Eligibility and Enrollment. *DEERS is one of the main MHS GENESIS external interfaces, and users observed patient identification and safety problems with it (e.g., date of birth data discrepancies).* Healthcare operations are sensitive to the age of the patient, particularly with newborns, and *inaccurate data can create patient safety concerns.* The PMO worked rapidly to address this problem. (Emphasis added.) (page 9)

305.    JTIC concluded that, as of April 30, 2018, MHS GENESIS, the DoD's EHR IT system

provided by Defendants, or one or more of them, did not have interoperable EHRs.

306.    As of May 2018, the DoD had 55 hospitals and 373 clinics worldwide.

**The DoD's Modification Of Its DoD EHR Contract To Include The U.S. Coast Guard Is Based On Defendants' Representations And Cerner's Refusal To Make Its Intellectual Property Accessible For Open Use And Competition**

307.    As reflected in the Justification Memo referenced at paragraphs 290-294, the DoD

modified its DoD EHR Contract to include the U.S. Coast Guard.

308.    The modified DoD EHR Contract, Contract No. N00039-15-D-0044B, added

approximately $1.1 billion to Defendants' contract.

309.    The Justification Memo states:

This Justification & Approval (J&A) supports a modification to contract N00039-15-D-0044 with Leidos, Inc. to add additional ceiling and scope supporting the efforts described in Paragraph 3 [of the Justification Memo], which are necessary to 1) support the incorporation of the United States Coast Guard (USCG) into the existing Department of Defense (DoD) MHS GENESIS Electronic Health Record

(EHR) implementation, and 2) to establish a common standardized EHR baseline with the USCG and the Department of Veterans Affairs (VA). The VA will contract for and conduct its own implementation of MHS GENESIS, while the USCG will join the DoD enterprise implementation under this subject contract that is already under way.

310. Any interoperability problems associated with the DoD EHR Contract equally apply to EHRs for the U.S. Coast Guard.

311. Part of the justification to modify the DoD EHR Contract to include the U.S. Coast Guard was the VA Secretary's Determination and Findings issued on or about June 1, 2017, to support awarding Defendant Cerner a sole source award to overhaul, upgrade and manage the VA's EHR IT System.

312. The award of the DoD EHR Contract to include the U.S. Coast Guard was also based on the representations of Defendants, or one or more of them, that they have the current expertise to achieve interoperability of EHRs.

**Further Evidence That Defendants Leidos and Cerner Misrepresented Interoperability To The DoD And The VA, Which Plagued The DoD EHR Contract From The Start And Now Plagues the VA and U.S. Coast Guard Contracts**

313. In or about May 2018, Defendants, or one or more of them but principally Cerner and Leidos, completed the rollout of its MHS GENESIS EHR IT system at four DoD pilot sites in the State of Washington.

314. In or about May 2018, a Pentagon report revealed problems with the DoD MHS GENESIS system's functionality.

315. As a result of the functionality problems highlighted in the 2018 Pentagon report, the DoD had to prematurely stop its evaluation of the fourth pilot site to "remediate significant problems discovered at the first three."

316. In other words, the DoD EHR IT system had not achieved intra-operability or

interoperability across the 4 pilot sites, let alone the entire DoD healthcare locations worldwide.

317.   As of the filing date of this Complaint, the MHS GENESIS system deployed by Defendants, or one or more of them, at DoD facilities has failed to achieve intra-operability and/or interoperability of EHRs for service members throughout the DoD healthcare system.

318.   As of the filing date of this Complaint, Defendants have not achieved intra-operability and/or interoperability of EHRs throughout the VA's worldwide EHR IT healthcare system.

319.   As of the filing date of this Complaint, Defendants have not achieved interoperability between the DoD EHR IT healthcare systems and the required DoD corporate systems.

320.   As of the filing date of this Complaint, Defendants have not achieved interoperability of EHRs between the DoD and private medical service providers serving servicemembers.

321.   All prerequisite conditions for the filing of this lawsuit have been satisfied.

### COUNT I
### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
### (Submitting or Causing to Be Submitted False or Fraudulent Claims to the United States)

322.   The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

323.   In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Government.

324.   Defendants' fraudulent claims for payment, included but are not limited to falsely certifying compliance with federal law, regulation, such as the OMB Circular A-130, and DoD EHR Contract terms that are prerequisites for payment.

325.   Defendants' fraudulent claims for payment, include but are not limited to (1) knowing failure to perform a material requirement of the DoD EHR Contract without disclosing the nonperformance, (2) obtaining the DoD EHR Contract based on false information about

Defendants' current capability to achieve DoD and U.S. Coast Guard EHR intra- and interoperability, (3) submitting false progress reports stating that Defendants' computer software was compliant with DoD EHR Contract requirements, and (4) substandard software products being sold to the Government; and (5) violations of the Federal Truth in Negotiations Act, 10 U.S.C. § 2306a.

326.    Defendants obtained the DoD EHR Contract through fraudulent means, representations, inducements and false certifications.

327.    By virtue of the false statements, false certifications, and fraudulent conduct described herein, Defendants knowingly made, or caused to be made, false and fraudulent claims for federal funds.

328.    Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements, and/or created false records, to obtain contracts through fraudulent means and to get a false and fraudulent claim against such contracts paid.

329.    Unaware of the false and fraudulent nature of the technical proposals of Defendants Cerner and Leidos, the United States – in reliance on the claims and certifications submitted therewith – awarded the DoD EHR Contract to Leidos and then a modified award to Leidos on a sole source basis, and the United States was damaged thereby.

330.    The amount of damages would include the total sum paid out or otherwise disbursed against the DoD EHR Contract the Defendants obtained based on false claims, representations and inducements, including claims that included knowingly false and material statements.

331.    Defendants' false statements and certifications diverted government funds intended to be provided and which by law could only be provided to make an IT investment in the DoD EHR IT system overhaul and upgrade based on a finite, bounded dictionary of elements and strings, as

those terms are defined in paragraph 13 above, to enable the DoD and U.S. Coast Guard EHRs to be intra- and interoperable.

332.    As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

333.    Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

334.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

335.    Each separate submission of a fraudulent contract claim is subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) per occurrence.

336.    Defendants are jointly and severally liable for all damages.

337.    Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

### COUNT II
### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(B)
### (Causing to Be Made or Used False Records to Submit False or Fraudulent Claims to the United States or to Avoid Obligations)

338.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

339.    In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made or used false records to submit false or fraudulent claims for payment or approval by the Government, or to avoid obligations to the Government.

340.    In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used or caused to

be made or used, the false records and statements described above to obtain payments from the DoD under the DoD EHR Contract and/or Task Orders ("TOs") associated with that government contract, with knowledge they were false and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

341.    Defendants obtained the DoD EHR Contract through fraudulent means, false certifications and by making or using false records.

342.    By the false statements, false records, false certifications and fraudulent conduct described herein, Defendants knowingly made, or caused to be made, false and fraudulent claims for federal funds.

343.    Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements, and/or created false records, to obtain contracts through fraudulent means and/or inducement and to get a false and fraudulent claim against such contracts paid.

344.    Unaware of the false and fraudulent nature of the technical proposals and/or representations regarding their respective capabilities to currently achieve DoD EHR interoperability submitted by Defendants Cerner and Leidos, the United States – in reliance on the claims, representations and/or certifications submitted therewith – awarded the DoD EHR Contract to Defendant Leidos, who then subcontracted with the remaining Defendants, and the Government was damaged thereby.

345.    The amount of damages include the total sum paid out and disbursed on the DoD EHR Contract and every subsequent TO the Defendants submitted, and submit going forward, or caused to be submitted that were awarded on behalf of the United States based on false claims, including but not limited to materially false statements as to past performance, both under the DoD EHR IT system contract (MHS GENESIS) and/or private sector contracts.

346.    Defendants' false statements, false records and false certifications claiming capabilities to achieve EHR interoperability diverted government funds intended to be provided and which by law could only be provided to an IT investment that was properly issued based on a bounded EA model, in compliance with federal law, rules and regulations (as set forth above).

347.    As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

348.    Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

349.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

350.    Each such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

351.    Defendants are jointly and severally liable for all damages.

352.    Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

**COUNT III**
**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(G)**
**(Avoiding an Obligation Owed to the United States)**

353.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

354.    The Defendants knew that each time a payment from the United States was transmitted to Defendant Leidos, who in turn transmitted payment to each Defendant subcontractor, that a violation of the DoD EHR Contract specification, OMB Circular A-130 and other laws, rules,

regulations and contract terms required by the DoD EHR Contract to be followed, did occur and that the government suffered a loss in the amount of each payment made and received by Defendants.

355.    In violation of 31 U.S.C. § 3729(a)(1)(G), the Defendants knowingly concealed violations of the False Claims Act and concealed the requirement that the EA had to be specified and bounded with finite elements and strings (as defined in paragraph 13 above) in order to solve the EHR IT decision problem and achieve intra- and interoperability.

356.    The Defendants thereby purposely concealed the violations of laws, rules and regulations pertaining to IT investments in order to obtain payments under the now approximately $5.5 billion DoD EHR Contract (and growing).

357.    In carrying out these wrongful acts, Defendants have engaged in a protracted and continuing course and pattern of fraudulent conduct that deceived the United States into believing that interoperability had been achieved in the private sector and would in the short term be achieved at the DoD and U.S. Coast Guard under the DoD EHR Contract and at the VA under the VA EHR Contract once the commercial-off-the-shelf Cerner "Millennium" software was installed, configured, customized and implemented at the DoD, VA and U.S. Coast Guard.

358.    As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

359.    Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

360.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

361.    Each such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

362.    Defendants are jointly and severally liable for all damages.

363.    Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

## COUNT IV
### (Conspiracy to Violate the False Claims Act, 31 U.S.C. §3729(a)(1)(C))

364.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

365.    Defendants conspired with each other to commit the violations of 31 U.S.C. § 3729(a)(1) (A), (B), and (G) described above.

366.    As described throughout this Complaint, all Defendants knew about the scheme to defraud the United States by making false records, statements, representations, inducements and certifications in violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

367.    By participating in this scheme, Defendants implicitly agreed to form a conspiracy to violate 31 U.S.C. § 3729(a)(1)(A), (B), (D) and (G).

368.    Each of the Defendants committed one or more overt acts in furtherance of the conspiracy to violate 31 U.S.C. §§3729(a)(1)(A), (B), and (G), including but not limited to each time they made false records, false statements, and/or false certifications to conceal from the United States the Defendants' fraudulent scheme and false claims, and each time false claims were submitted or caused to be submitted to the United States.

369.    Defendants conspired with each other to and did obtain the DoD EHR Contract through fraudulent means in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

370.    Defendants conspired with each other to and did modify the DoD EHR Contract to include

the U.S. Coast Guard through fraudulent means in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

371.   Defendants knowingly conspired with each other to make, or caused to be made, false and fraudulent claims for federal funds.

372.   Defendants, and each of them, knowingly conspired to make or caused to be made false and fraudulent statements, and/or created false records, to obtain the DoD EHR Contract through fraudulent means and to get a false and fraudulent claim against such contract and TOs paid.

373.   Unaware of the Defendants' conspiracy or the false and fraudulent nature of Defendants statements, representations, inducements and/or certifications, the United States – in reliance on the claims, statements and certifications submitted therewith – awarded the DoD EHR Contract to Leidos, who in turn awarded subcontracts to the other Defendants, and was damaged thereby.

374.   The amount of damages includes the total sum paid out and disbursed on the DoD EHR Contract and each TO for which the Defendants submitted or caused to be submitted claims for payment.

375.   Defendants' false statements, inducements and/or certifications claiming Defendants Cerner, Leidos and/or the other Defendants were successful in past performance to achieve interoperability diverted government funds intended to be provided and which by law could only be provided to an IT investment that was properly issued based on a bounded EA model, in compliance with federal law, rule or regulation.

376.   Defendants' false statements, inducements and/or certifications claiming Defendants Cerner, Leidos and/or the other Defendants were successful in past performance to achieve interoperability was, and is, a continuing violation of the DoD EHR Contract specifications, OMB Circular A-130 and other laws, rules and regulations required by the DoD EHR Contract to be

68

followed, and the United States government suffered a loss in the amount of each payment made and received by Defendants.

377.    As a direct and proximate result of Defendants' conspiracy resulting in fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

378.    Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

379.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

380.    Each such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 -- $11,000).

381.    Defendants are jointly and severally liable for all damages.

382.    Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

383.    WHEREFORE, Plaintiff-Relator Eugene J. Guglielmo, Ph.D., on behalf of himself and the United States, requests:

   a.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, including but not limited to the full value of all economic benefits obtained by Defendants through their illegal conduct, plus a civil penalty of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each violation of 31 U.S.C. § 3729;

b.     That Plaintiff-Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the United States does not intervene;

c.     That Plaintiff-Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees, with interest, including expert witness fees;

d.     That Plaintiff-Relator and the United States be awarded pre-judgment interest on all monies awarded;

e.     That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds awarded to the United States from any alternate remedies under the False Claims Act, pursuant to 31 U.S.C. §§ 3729(a)(1), 3730(c)(5), 3730(d), including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

f.     That Plaintiff-Relator be granted all other relief provided for in the False Claims Act not specifically referenced above; and

g.     That all appropriate equitable relief be awarded.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a jury trial.

Dated: May 29, 2019                         Respectfully submitted,

                                            KALBIAN HAGERTY, LLP

                                            By _____
                                            Eric L. Siegel
                                            Bar No. 427350
                                            888 17th Street, N.W., Suite 1000
                                            Washington, D.C. 20006
                                            (202) 419-3296
                                            esiegel@kalbianhagerty.com

                                            *Attorney for Plaintiff Relator*
                                            *Eugene J. Guglielmo, Ph.D.*